**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**

KAREN CAHOON, AS EXECUTRIX OF THE )
ESTATE OF GRACE WEBSTER, DECEASED, )
                                        )
        Plaintiff, )
                                       ) **Civil Action No.: 2:17-CV-63-D**
        vs. )
                                          )
EDWARD ORTON, JR. CERAMIC FOUNDATION, )
METROPOLITAN LIFE INSURANCE COMPANY, and )
UNION CARBIDE CORPORATION, )
                                        )
        Defendants. )

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT**
**EDWARD ORTON, JR. CERAMIC FOUNDATION'S**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiff, KAREN CAHOON, AS EXECUTRIX OF THE ESTATE OF GRACE

WEBSTER, DECEASED (hereinafter referred to as "the Plaintiff"), submits this brief in

opposition to Defendant EDWARD ORTON, JR. CERAMIC FOUNDATION'S (hereinafter

"Defendant") Motion for Summary Judgment.

**Introduction**

This case arises out of Decedent Grace Webster's development of, and death from,

malignant pleural mesothelioma—a rare form of cancer which attacks the lining of the lungs and

which is caused by exposure to asbestos. Defendant sold a product, pyrometric cones, that it

packed in vermiculite. At relevant times this vermiculite was contaminated with tremolite, an

asbestos material, which Plaintiff alleges caused Decedent's mesothelioma. Defendant has filed a

Motion for Summary Judgment on four issues: (1) Breach of Duty and Causation; (2) Breach of

Implied Warranty; (3) Failure to Warn; and (4) Willful and Wanton Behavior Warranting Punitive

1

Damages. Defendant's position that no question of fact exists as to these issues is clearly misplaced in light of the overwhelming evidence of Defendant's culpability.

**Statement of Facts**

**Ms. Grace "Holly" Webster's Background and Exposure:**

Grace Webster was a resident of North Carolina at all times relevant hereto up until the time of her passing from malignant mesothelioma. Decedent's daughter, Karen Cahoon, was deposed November 27, 2018. *See* Deposition Transcript of Karen Cahoon, Nov. 27, 2018, attached hereto as ***Exhibit 1***. She testified that her mother started working with ceramics in the 1960's. In approximately 1968 she began doing this work professionally and continuously through 2000. *Id*. at 11, 38. Decedent regularly taught four to six classes a week at the College of the Albemarle and also held drop-in classes at her studio. *Id*. at 18, 19. Decedent had a ceramics studio on her property where she taught all her classes. There was a small enclosed area where she fired her kilns and stored the pyrometric cones along with student's work to be fired. She frequently walked back and forth between the bench and kilns. *Id*. at 11-14; 18, 26-28, 31-32.

Decedent exclusively used Orton brand pyrometric cones for firing her kilns, which she purchased at a ceramics store called Ceramics by Stu-Doodle (hereafter "Stu-Doodle"), located in Elizabeth City, North Carolina. *Id*. at 19-24, 32-24. Mrs. Cahoon recalled accompanying her mother to Stu-Doodle most of the time, and Decedent purchased the cones regularly, generally on a weekly basis. *Id*. at 32-34. The Orton cones were small reddish-brown triangle shaped objects that came in a box full of vermiculite. *Id*. at 23. Decedent would regularly and frequently remove pyrometric cones from the box. This process entailed opening the box, reaching in with her fingers to dig around the vermiculite until she located and retrieved a cone. *Id*. 23-24. Decedent often dumped the vermiculite and cones out of the boxes onto a tray to make locating the cones easier.

2

*Id.* 24.  To clean up the vermiculite material, she swept the vermiculite packing material off the tray and scraped it off with her fingers and would dump it in the trash.  Plaintiff testified that a lot of the pieces would end up on the floor, explaining that her mother would wipe the material off of the countertop as well.   Decedent also used a broom and dust pan to sweep the material off the floor. All these activities created visible dust that she breathed on a frequent and regular basis.  *Id.* at 23-31.

Plaintiff's testimony is corroborated by the deposition testimony of fact witness Elaine Garrett.  Ms. Garrett worked at Stu-Doodle in Elizabeth City, North Carolina from 1974 to 1984. She recalled Stu-Doodle was selling the Orton pyrometric cones when she started working there in 1974, and that she saw Defendant's name "Orton" on the shipping boxes shipped to Stu-Doodle, which she regularly unpacked during her employment at Stu-Doodle.  *See Exhibit 2*, Deposition of Elaine Garrett, April 3rd, 2019, p. 33-34, 42-3, 57-59.   Further, Ms. Garrett recalls that throughout her ten years of employment, Stu-Doodle purchased pyrometric cones directly from Defendant Orton Cones on a regular and continuous basis and that Decedent purchased these cones from Stu-Doodle on a regular and continuous basis, nearly weekly.  *Id.*

**Defendant's Sale of Asbestos Contaminated Vermiculite:**

In addition to the above testimony, Defendant located and subsequently produced in October of 2018 a large quantity of receipt ledgers that reflect sales by Defendant to distributors around the country.  *See Exhibit 3*, Deposition of Defendant's Corporate Representative Mark Lawson, February 22, 2019 at p.38.  The sales ledgers, which Defendant identifies as "cash receipt journals" confirm at least eighteen separate sales transactions with Stu-Doodle between November of 1977 and February of 1980.  *See Exhibit 4*, Select Orton Receipts Journal pages.  Starting in June of 1980, the entries change, no longer reflecting customers and appear to be mostly internal

accounting, so it is likely that these sales to Stu-Doodle continued in light of Plaintiff and Elaine Garrett's testimony of such sales. *Id.* at ORTON 0765.

During investigation of this matter, Plaintiff discovered fourteen boxes of Orton pyrometric cones packed in vermiculite in her mother's ceramics shop, ten of which tested positive for Libby amphibole asbestos, a signature of W.R. Grace tremolite contaminated vermiculite. **Exhibit 5,** Report Dr. Compton of MVA, Scientific Consultants dated July 17, 2018. One of the boxes was stamped with the writing "Ceramics by *Stu-Doodle*" and the Elizabeth City, North Carolina address. *Id.* at p. 20. This box tested positive for asbestos. *Id.* at 3.

**Defendant's Use and Knowledge Regarding Asbestos Contaminated Vermiculite**

The Edward Orton Jr. Ceramic Foundation was established in 1932 in Ohio to continue the operation of the Standard Pyrometric Cone Company for the benefit of the ceramic arts and industry. Orton is the longest continuous manufacturer of pyrometric cones in the world, and ships to over 70 countries worldwide. **Exhibit 6**, *History of Orton.* Orton began manufacturing pyrometric cones in 1896. As of 2007, Orton was selling over 12 million cones per year; this number had decreased from its peak sales in the 1970's and 1980's. **Exhibit 7**, *Deposition of Orton's Corporate Designee, Gary Childress, 11/28/07 at 20, 115.* Orton cones are used to measure kiln temperatures in the firing of ceramics. These cones are placed inside a kiln and deform at specific temperatures; once the kiln has reached its desired temperature, the cone will melt and either 1) trigger the kiln's automatic shutoff device, or 2) provide a visual indication to the ceramicist as to when the kiln has reached its desired temperature.

Prior to 1963, Orton packaged its pyrometric cones in sawdust. **Exhibit 8**, *Deposition of Orton's Corporate Designee, Dale Fronk, 5/8/08 at 11-12.* In 1963, Orton made the decision to cease packing these cones in sawdust due to difficulties in obtaining it in the quantities Orton required. *Id.*

4

At that time, Orton looked at six to eight alternatives to sawdust, and subsequently decided to begin using vermiculite from Libby, Montana ("LAA") for its packaging material. *Id.* Other than Libby vermiculite, other alternatives they considered were ground up corncobs, peanut shells, popcorn, and things of that nature. *Id.* In considering these various alternatives, Orton did not perform any research or conduct any inquiry as to the possible health hazards that may have been associated with these materials. *Id.* Further, at no time in its history did Orton perform any testing on the vermiculite packaging material it used. ***Exhibit 7***, *Childress 11/28/07 deposition at 95*. At no time did Orton provide any warnings to its customers regarding the hazards of the LAA vermiculite packaging it sold, nor did it ever provide its customers any warning or suggestion to wear protective equipment when handling or otherwise manipulating this vermiculite material. *Id. at 116.*

Orton's Corporate Designee, Gary Childress, testified regarding Orton's purchase, use, and sale of packing materials contained in the boxes of Orton pyrometric cones over the course of the company's history. With regard to Orton's purchases of vermiculite, Orton produced as authentic business records a collection of cancelled checks, which provide a perspective as to the dates that Orton obtained vermiculite from each supplier. *See **Exhibit 7**, Childress 11/28/07 deposition at 46-67; **Exhibit 9**, Orton's cancelled checks (originally attached to Childress 11/28/07 as deposition exhibit 3); and **Exhibit 10**, Declaration of Gary Childress, 11/1/07 (originally attached to Childress 11/28/07 as deposition exhibit 2).*

| W.R Grace / Zonolite | March 1963 – June 1975 |
| --- | --- |
| J.P. Austin[1] | September 1975 – June 1979 |

---

[1] At this time, Plaintiff is unaware of any evidence suggesting that the vermiculite from J.P. Austin contained asbestos.

| W.R. Grace / Zonolite | September 1979 – early 1982 |
|---|---|
| J.P. Austin | July 1982 – March 1983 |

After purchasing, using, and selling vermiculite for eighteen years, on September 2, 1981,

Dale Fronk, Ceramic Engineer for Orton, sent the following letter to W.R. Grace & Co., which reads:

Dear Sirs:

We are required by Federal law to obtain Material Safety Data Sheets for all material we use in the manufacturing of our product, pyrometric cones.

We are currently using and purchasing from your organization Industrial #2 expanded vermiculite. Although this material does not go directly into our product, it is used as a packaging material.

We would appreciate obtaining the above mentioned Material Safety Data Sheets from you along with any other data on Industrial #2 expanded vermiculite which may be valuable to us.

*Exhibit 11, Orton Letter to W.R. Grace & Co., 9.2.81 (originally attached to Childress 11/28/07 as deposition exhibit 5).*

W.R. Grace & Co. responded to Mr. Fronk's request on September 25, 1981, which reads:

Dear Mr. Fronk:

This is in response to your recent request for a Material Safety Data Sheet for Industrial Vermiculite #2 which you have been using as packing material.

I am attaching a copy of our M.S.D.S. #Z-140, Industrial Vermiculite, Libby Source- Size #1, #2 & #3.

#3 Expanded Vermiculite is also marketed to consumers as Attic Insulation. When processed for this end-use, it is more intensively screened to remove fines (vermiculite dust and tremolite) and in some cases, it is treated with a binder of the user to airborne tremolite fiber. You may wish to purchase this to limit dust exposure. It is readily available at most building supply houses.

We have prepared the attached Material Safety Data Sheet in a form that is most meaningful to technically aware industrial end-users who will be aware of the responsibilities placed on them by OSHA Regulations.

6

> It has been our experience, handling significant tonnages of expanded productfs in our own manufacturing plants, that good industrial hygiene practices will limit the airborne exposures of employees to extremely low levels.

> *Exhibit 12, W.R. Grace & Co. letter to Orton, 9/25/81 and accompanying MSDS #Z-140, 6/10/77 (originally attached to Childress 11/28/07 as deposition exhibit 6).*

As referenced in this September 25, 1981 letter, W.R. Grace attached its MSDS for Industrial Vermiculite #2, dated June 10, 1977. This MSDS states:

- Synonyms for this materials include Expanded Libby, Montana Vermiculite;
- Industrial Vermiculite #2 (which Orton used as a packing material) contains naturally occurring contaminant tremolite;
- OSHA defines tremolite as asbestos;
- The physical handling given to expanded Vermiculite can release both airborne fibers and nuisance dust;
- When using Industrial Vermiculite #2, the product should be dampened slightly or one should employ other techniques which control airborne fibers and dust;
- Personal protective equipment should be used to meet exposure limits.

*Id.*

It should be noted that, on December 1, 1978, Orton received an analysis dated October 8, 1976 of the J.P. Austin vermiculite it was using at the time. The objective of this study was to determine the mineralogy of the sample and specifically isolate and identify any fibrous materials that may be present. Its conclusion reads: "No asbestos was found during this intensive analysis program." (*emphasis in original*). *Exhibit 13, Analysis of Crude Vermiculite, 10/8/76 (originally attached to Childress 11/28/07 as deposition exhibit 6).* Despite this, less than a year later, in September 1979, Orton returned to purchasing LAA containing vermiculite from W.R. Grace, as referenced above. Furthermore, the supplier of the contaminated vermiculite, Zonolite/W.R. Grace, sent its vermiculite MSDS sheet to its customers in 1974. *Exhibit 14, W.R. Grace Interrogatory Response 16, pg. 22.* As shown above, in 1974 Orton was a customer of W.R. Grace for vermiculite.

Undeterred by its knowledge regarding the hazards of the LAA vermiculite it was selling, Orton never warned its customers regarding the hazards of the product it sold, did not pass on

information from the MSDS sheet regarding these hazards, and did not recommend the wet down procedures or personal protective equipment as referenced in this MSDS sheet. *Exhibit 8, Fronk 5/8/08 deposition at 74-78.* The importance of warning labels has been recognized by the industry for many decades, and was certainly required by OSHA in 1972. *Exhibit 15 1972 Federal Register, pg. 6.*

In 1983, Orton ceased using vermiculite as its packaging material, not for safety reasons, but because the vermiculite "created a lot of dust and [this dust] made the plant dirty." *Exhibit 7, Childress 11/28/07 deposition at 96; also see Exhibit 16, 9/1/83 internal Orton memo, at "IV Goal."* At that time, Orton began packaging its cones in styrofoam, a practice that continues to this day. *Id.; Exhibit 10, Childress declaration, 11/1/07.*

Additional evidence illustrates how long and deep the state of the art on LAA and Defendant's knowledge of the hazards of LAA and asbestos run. The asbestos contamination of Libby vermiculite has been written about and studied for nearly a century. In 1928, *Contributions to Economic Geology* published a paper by J.T. Pardee and E.S. Larsen discuss the contamination of the Libby Montana vermiculite deposits with amphibole asbestos. *Exhibit 17, Pardee/Larsen article, pg. 1.* Defendant, founder and continuous member of the Ceramics Society since its inception, received numerous publications for the Ceramics Society discussing the hazards of asbestos over the years, including in 1931 where the Ceramics Society reviewed the book Effects of Asbestos Dust on the Lungs and Dust Suppression in the Asbestos Industry by Merewether and Price, published in 1930 and addressing asbestosis as an occupational disease. *Exhibit 18, Ceramics Abstracts complied by The American Ceramic Society, Volume 10, 1931.* In 1933, the Ceramics Journal, received by Defendant, discusses seventeen separate publications on asbestos disease, indicating that breathing asbestos causes disabling and fatal lung disease and the

importance of education on the dangers. *Exhibit 19, 1933 Ceramics Journal.* In 1937, Defendant received the Ceramics Journal containing four articles discussing asbestos disease. *Exhibit 20, Ceramic Abstracts complied by The American Ceramic Society, Volume 16, 1937, pg. 3, 9, 18, 21, 29, 33, 37, 38, 40, 42, 43, 44, 79, 80, 116, 136, 151.* In March of 1940, the American Ceramic Society Bulletin publishes an article, Summary of Occurrences, Properties, and Uses of Vermiculite, which discusses the Vermiculite and Asbestos Company of Libby, Montana and that the material is "high in amphibole asbestos." *Exhibit 21, Ceramics Society Bulletin March 1940, pg. 63.* This same publication contains Defendant's 1939 balance sheet and Defendant's advertising and other references and pictures of the Defendant's founder. *Id* at 11, 33 37. Additional articles regarding asbestos in the Libby vermiculite were published over the years including articles in 1948, 1959, 1959, and 1970. *Exhibits 22 Perry, 23 Bassett, 24 Johns, 25 Johns.* In Defendant's home state of Ohio in 1946, Ohio had instituted requirements for the prevention and control of industrial and public health hazards including asbestos. *Exhibit 26, State of Ohio Legal Requirements for the Prevention and Control of Industrial Public Health Hazards, 1946, at 9, 16.* The State of Montana Board of Health, Division of Disease Control, published a report in 1956 discussing the toxicity of the asbestos contamination regarding W.R. Grace's operations in Libby, Montana. *Exhibit 27, Montana Board of Health Report, 1956.*

**Plaintiff's Experts**

On May 7, 2019 Plaintiff produced to Defendant the reports of Dr. Terry Spear, Dr. Brent Staggs and Dr. Richard Cohen. Dr. Spear has extensive experience in the field of industrial hygiene generally and related to the W.R. Grace mine near Libby, Montana for approximately twenty years. *Exhibit 28, Report of Dr. Spear dated April 1, 2019.* Dr. Spear offers detailed opinions regarding asbestos contamination of vermiculite from the Libby, Montana mine; the

9

toxicity of LAA, the exposure pathway regarding the use of Defendant's asbestos contaminated vermiculite packed pyrometric cones and fiber re-entrainment; fiber release; knowledge of asbestos hazards in scientific and occupational medicine literature, asbestos exposure and mesothelioma, early knowledge of Libby amphibole asbestos hazards; as well as Grace Webster's exposure history. *Id.*

Plaintiff has also submitted the expert report of Richard Cohen, MD, a licensed physician, Masters of Public Health, Board Certified in Preventative Medicine and Occupational Medicine, who opines both that Decedent's exposure to amphibole asbestos containing vermiculite packing material was the proximate cause of the mesothelioma, as well as asbestos historical state of the art. *Exhibit 29*. Brent Staggs, M.D., Board Certified in Anatomic Pathology, Clinical Pathology and Hemetopathology, opines that Decedent had significant exposures to asbestos from her frequent and proximate work with and around Libby amphibole asbestos released from the vermiculite packaging associated with Orton pyrometric cones, and that, to a reasonable degree of medical certainty, Decedent had malignant mesothelioma that was caused by these identified and substantial exposures to asbestos. Dr. Staggs also opines on asbestos historical state of the art. *Exhibit 30.*

Finally, Plaintiff submitted the report of Dr. Steven P. Compton, Analysis of Vermiculite Packing Material of Orton Pyrometric Cones. Dr. Compton tested boxes of Defendant's cones that belonged to Decedent, many of which were found to be contaminated with asbestos. *Exhibit 5.*

## **STANDARD OF REVIEW**

The standard for summary judgment pursuant to Federal Rule 56 is well defined. Summary judgment is appropriate only when there is no genuine issue of material fact, and movant has met its burden of proof that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). In reviewing the evidentiary record, all facts and inferences therefrom must be viewed in the light most favorable to the nonmovant. See, e.g. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*, 475 U.S. 574 (1986). Only if the moving party has carried its initial burden under Rule 56, then the nonmovant must show more than 'metaphysical doubt as to the material facts;" it must present affirmative evidence to create a genuine fact issue. *Id*. at 586-87.

## BREACH OF DUTY AND CAUSATION

Defendant argues that Plaintiff has no evidence (1) of the Foundation's negligence in using and selling asbestos contaminated vermiculite packing for its pyrometric cones or (2) that the Defendant's actions proximately caused Decedent's death. To bolster this erroneous position, Defendant mischaracterizes the nature of its relationship with the vermiculite in question, likening itself to a retailer who is a mere conduit of the offending material, rather than a manufacturer. Even if Defendant was simply a retailer who simply passed along a finished product in the stream of commerce, its actions would still amount to negligence. As a preliminary matter, this claim falls squarely under the products liability law of North Carolina which allows claims as follows:

> "Product liability action" includes any action brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formulation, development of standards, preparation, processing, assembly, testing, listing, certifying, warning, instructing, marketing, selling, advertising, packaging, or labeling of any product.

Here, the Defendant carefully and intentionally selected vermiculite to use as a packing material for its pyrometric cones, casting aside other (safe) alternative materials. *Exhibit 7,* Childress Deposition pg. 95; *Exhibit 8*, Fronk Deposition at 11-12. The vermiculite material was removed from the original packaging provided by the supplier.[2] Defendant then placed the material into its own boxes, labeled them with Defendant's name, where the asbestos contaminated vermiculite was mixed together with the pyrometric cones, such that a user would have no choice but to be exposed to the vermiculite each and every time the user extracted a cone from the box.

Defendant relies on *Cockerham v. Ward* for the proposition that it was under no duty to test the vermiculite material for a latent defect because it was a mere retailer. *Cockerham v. Ward*, 44 N.C. App. 615 (N.C. App. 1980). In *Cockerham*, the Plaintiff sued both the manufacturer and retailer of a rubber strap which broke, causing plaintiff's injury. In examining the duty of the manufacturer (whose role was attaching a metal hook to a rubber strap manufactured by another, akin to Defendant's actions here), the Court noted that Plaintiff must prove that the manufacture was negligent in its design of the product, in its selection of materials, in its assembly process, or in inspecting of the product. *Id*. at 619. Plaintiff has presented evidence to support all of these theories. Defendant designed and assembled the vermiculite packed pyrometric cones, and Defendant intentionally selected the asbestos-contaminated vermiculite to combine with its pyrometric cones, packaging the two together such that they are inseparable. Defendant *failed to inspect or test* this product, or to even ask the supplier of the product about its safety. *Exhibit 8, Fronk at 11-12, Exhibit 7, Childress at 95.* Defendant did not warn of the dangers associated with its product at any time. *Exhibit 7 at 116.*

---

[2] The supplier was W.R. Grace, a bankrupt entity.

Even if the Court examines the elements of a negligence claim against a retailer of a product (which Defendant is not), Plaintiff has presented sufficient evidence to support such a claim. Plaintiff has presented evidence at the outset of this response to demonstrate that Defendant should have known the hazards of LAA as far back as 1923, with public information available on the subject regularly thereafter. ***Exhibits 17-27.*** These materials are only a selection of the information that was disseminated on the subject over the years. Further, Defendant had indisputable knowledge about the hazards of asbestos and LAA in publications it received directly starting in 1940. ***Exhibit 21.*** Defendant also received information directly from the vermiculite manufacturers, that vermiculite could contain asbestos and that the vermiculite it had used for many years did contain asbestos starting in 1974. ***Exhibit 14***, Grace Answer to Interrogatory Answer 16. Defendant could very easily have obtained the information from its supplier, W.R. Grace, which was available well before Defendant asked for the MSDS sheets in 1981 and well before Defendant replaced the offending material with a safe alternative in 1983. ***Exhibits 8, 11, 12, 13 14.*** A reasonably prudent company would have and should have done so. Despite this extensive knowledge, Defendant continued to sell its deadly product without a single warning or recall of this defect to its customers and end users. Defendant concedes in its Motion for Summary Judgment (pg. 10) that, if it was aware of, or through reasonable diligence could have discovered the defect in the product at the time of sale, then it is liable in negligence. Plaintiff has presented sufficient evidence to demonstrate that triable questions of fact exist regarding whether Defendant failed to exercise due care in the manufacture and sale of its pyrometric cones packed in asbestos-contaminated vermiculite and failed to recognize when it should have that the product's proper use involved the unreasonable risk of harm to those using it for the purpose for which it was intended. *Cockerham at 619.*

Finally, Plaintiff has presented evidence sufficient to create a question of fact establishing that Defendant's product was the proximate cause of her death from mesothelioma. Plaintiff has produced the reports of Dr. Cohen and Dr. Staggs. Both doctors opine that Grace Webster's mesothelioma was caused by her frequent, repeated, excessive and proximal asbestos exposure that resulted from her work with and around the amphibole asbestos-containing vermiculite component of Orton's pyrometric cones. *Exhibit 28, Report of Dr. Cohen;  Exhibit 29, Supplemental Report of Dr. Staggs.*  Dr. Spear also discusses the carcinogenic nature of the asbestos-contaminated vermiculite to which Decedent was exposed, and the pathway to her exposure through creating dust through the proper use of Defendant's pyrometric cones and the concept of fiber re-entrainment. Dr. Spear opines that the asbestos fibers remain airborne for hours once they are introduced into the air and settled fibers can be reintroduced into the air by movement and air turbulence, causing additional exposures. *Exhibit 2.*  Plaintiff testified to her mother's regular purchase of Orton pyrometric cones during the years Defendant incorporated asbestos-contaminated vermiculite into the product. Decedent frequently and regularly was exposed through her use of the Orton pyrometric cones on a daily basis over decades. She even had Orton pyrometric cones in asbestos-contaminated vermiculite in her possession at the time of her death. *Exhibit 1, Deposition of Karen Cahoon.*

Plaintiff has met the standard under North Carolina law. The Fourth Circuit Court of Appeals has employed the Lohrmann exposure standard, requiring that plaintiff present "evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." *Jones v. Owens-Corning-Fiberglas Corp.*, 69 F.3d 712, 716 (4th Cir. 1995) (quoting *Lohrmann v. Pittsburgh-Corning Corp.*, 782 F.2d 1156, 1162-63 (4th Cir. 1986)). In adopting the frequency, regularity, and proximity standard,

the Lohrmann court explained that, "[i]n effect, this is a de minimis rule since a plaintiff must prove more than a casual or minimum contact with the product." Lohrmann, 782 F.2d at 1162. Further, Plaintiff is not conclusively required to demonstrate the amount, duration and intensity of her exposure to survive a motion for summary judgment, rather "[t]he Fourth Circuit has taken note of the intensity of exposure in an asbestos case." *Gore v. Air & Liquid Sys. Corp.*, No. 5:16-CV-716-BR, 2018 WL 4558182, at *8-9 (E.D.N.C. Sept. 21, 2018). *Lohrmann* was an asbestosis case, where greater exposure to asbestos is required to produce disease, as opposed to mesothelioma which can result from much lower relative exposure. Nonetheless, Plaintiff has sufficiently demonstrated that Decedent was exposed to the vermiculite packaging material of Orton pyrometric cones and, in fact, there has been no evidence that Plaintiff's Decedent was exposed to any asbestos-containing materials other than this vermiculite.

## <u>BREACH OF IMPLIED WARRANTY</u>

Defendant recites the elements of (1) the goods bought and sold were subject to an implied warranty of merchantability, (2) the goods did not comply with the warranty in that the goods were defective at the time of sale, (3) the injury was due to defective nature of the goods, and (4) damages were suffered as a result.

Defendant then incorrectly posits that privity of contract for breach of implied warranty claims is required to maintain an action for breach of implied warranty. However, pursuant to the North Carolina Products Liability Act, privity is only required when the claim is for economic loss. *Gregory v. Atrium Door and Window Co.*, 106 N.C. App 142, 144 (App. Ct. 1992). In this matter, Plaintiff is seeking to recover for non-economic losses and her claim is viable pursuant to N.C.G.S.A. sec. 99B-2(b), where:

> A claimant who is a buyer, as defined in the Uniform Commercial Code, of the product involved, or who is a member or a guest of a member of the family of the buyer, a guest

15

of the buyer, or an employee of the buyer may bring a product lability action directly against the manufacturer of the product involved for breach of implied warranty; and the lack of privity of contract shall not be grounds for the dismissal of such actions.

Decedent qualifies as a buyer under the Uniform Commercial Code which defines a buyer as:

a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind. A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices. A person that sells oil, gas, or other minerals at the wellhead or minehead is a person in the business of selling goods of that kind. A buyer in ordinary course of business may buy for cash, by exchange of other property, or on secured or unsecured credit, and may acquire goods or documents of title under a preexisting contract for sale. Only a buyer that takes possession of the goods or has a right to recover the goods from the seller under Article 2 of this Chapter may be a buyer in ordinary course of business. "Buyer in ordinary course of business" does not include a person that acquires goods in a transfer in bulk or as security for or in total or partial satisfaction of a money debt. U.C.C. §1-201(b)(9).

Finally, Defendant claims that Plaintiff has not produced any admissible evidence that the pyrometric cones packed in asbestos-contaminated vermiculite failed to perform their intended purpose, citing to *Bussian v. Daimlerchrysler Corporation*, 411 F. Supp. 2d 614. This case deals with a defective automobile, where the intended purpose is considered safe, reliable transportation. That court further explains that the "implied warranty of merchantability does not "impose a general requirement that goods precisely fulfill the expectations of the buyer. Instead, it provides for a minimum level of quality.'" *Bussian v. DaimlerChrysler* at 623 (citing *Skelton v. Gen. Motors Corp*, 500 F. Supp. 1181, 1191 (1980). Stated another way, "when a product is being used for its intended purpose in a normal way, a consumer's expectation that product will not injure lies within the warranty of fitness for an ordinary purpose." *Ried v. Eckerds Drugs,*

*Inc.*, 1979, 253 S.E. 2d 344 (N.C. App 1979).   Notably, North Carolina's Uniform Commercial Code §25-2-315 requires that for goods to be merchantable they must also be adequately contained, packaged, and labeled as the agreement may require.

Plaintiff has submitted sufficient evidence to create questions of fact such that this claim for breach of implied warranty of merchantability should survive for trial.  Defendant manufactured and packaged a defective product, pyrometric cones specially packed in asbestos-contaminated vermiculite.  Plaintiff has presented scientific and industrial hygiene articles, government regulations and expert testimony which demonstrate that asbestos, and asbestos contaminated vermiculite, is a defective and dangerous material. ***Exhibits 17-27.***   Defendant sold this defective product to the public for use in firing ceramics. ***Exhibits 1, 2, 6, 7.*** Defendant never warned that this product was dangerous or took any measures to protect end-users from exposure to asbestos from using this product, despite the availability of safer alternatives.

***Exhibit 7,*** *Childress deposition at 95, 116*. Grace Webster purchased this defective product, which was defective at the time of sale.  Grace Webster used this product for its intended purpose, causing her to be exposed to asbestos from use of Defendant's product. **Exhibits 1, 7, 27**.  Ms. Webster's exposure to asbestos from use of this product caused her to develop mesothelioma which took her life. ***Exhibits 28, 29***.  In another asbestos case out of the Middle District North Carolina, the Trial Court found that Plaintiffs had submitted sufficient evidence to defeat summary judgment and were allowed to proceed on breach of implied warranty and failure to warn claims.   *Logan v. Air Products and Chemicals Inc., et al.*, 2014 WL 3891366 (M.D.N.C. 2014)

## **DUTY TO WARN**

To make a claim of failure to warn, Plaintiff must demonstrate that "the manufacture or seller became aware of or in the exercise of ordinary care should have known that the product posed substantial risk of harm to a reasonably foreseeable user or consumer, and failed to take reasonable steps to give adequate warning or instruction or to take reasonable action under the circumstances." N.C. Gen. Stat. Ann. Sec. 99B-5(a)(1)-(2) (2001). Defendant insists Plaintiff's Failure to Warn claim should fail because Plaintiff has not shown that the Foundation had any knowledge that its asbestos contaminated vermiculite was hazardous or created a dangerous condition. In its defense, Defendant offers only one point, the opinion of its expert, Mark Lawson, that exposure to vermiculite that was contaminated with amphibole asbestos was not concluded by any governmental agency to be a potential health hazard until 1991.

This position is meritless in light of the extensive showing Plaintiff has made regarding Defendant's notice of, and actual knowledge of the hazards of asbestos. Moreover, Defendant knew and should have known of the fact that vermiculite could be contaminated with tremolite asbestos. As stated throughout this Opposition, as far back as the 1930's Defendant was in possession of articles detailing the health hazards associated with asbestos dust and methods to reduce exposures. *Exhibits 18-20*. Defendant was in possession of articles discussing the contamination of vermiculite from Libby, Montana with tremolite asbestos. *Exhibit 21.* Defendant had access to even more articles of this nature that were published over the decades. *Exhibits 22-25, 27.* Defendant was subject to regulations which required protections from asbestos and warnings to be placed on asbestos products. *Exhibits 15, 26*. Defendant was given information by its suppliers of vermiculite that the vermiculite was in fact contaminated with asbestos. *Exhibits 12, 13, 14.* There is no question that Defendant knew and should have known the hazards of asbestos and LAA that were posed to its customers.

Nonetheless, Defendant held this knowledge of the hazards of asbestos and asbestos contaminated vermiculite from Libby, Montana for many decades, but never warned of the dangers to users created by use of its pyrometric cones packed in contaminated vermiculite. Regarding asbestos, Defendant never labeled its products to indicate they contained asbestos, never issued a warning or caution label, never instructed the user to avoid creating dust, never warned about the health dangers of asbestos, and never instructed on the use of a respirator or dust mask. In another asbestos case out of the Middle District North Carolina, the Trial Court allowed Plaintiff to proceed on its implied warranty and failure to warn claims, denying Defendant's Motions for Summary Judgment. *See Logan v. Air Products and Chemicals Inc.,* et al., 2014 WL 3891366 (M.D. N.C. 2014)

## PUNITIVE DAMAGES

Punitive damages are available under North Carolina law for wrongfully causing the death of a person through conduct that is willful and wanton. N.C. Gen. Stat. §28A-18-2. "'Willful or wanton conduct' means the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm." N.C. Gen. Stat. §1D-5. It is more than gross negligence. *Id.* As discussed earlier, Plaintiff has offered significant evidence of Defendant's willful and wanton conduct. For decades, Defendant was on notice of and receiving information about the dangers of asbestos and LAA. Defendant continued to sell its pyrometric cones packed in vermiculite, despite having actual knowledge that the vermiculite it was using was contaminated with asbestos. Defendant knew that asbestos was lethal. Even after receiving explicit information in an MSDS sheet from the vermiculite supplier that the vermiculite Defendant packaged and sold was contaminated with asbestos, Defendant continued to sell this

material for years.  At all times, Defendant kept silent, warning no one that its asbestos-

contaminated products were potentially lethal.  This conscious disregard for the health, safety,

and wellbeing of its product users is more than sufficient evidence of Defendant's willful and

wanton product, deserving of punitive damages.

Defendant further argues that Plaintiff has presented no evidence that an officer, director,

or manager of the Foundation participated in or condoned the willful and wanton behavior of

Defendant.   North Carolina Courts define a "manager" as "one who conducts, directs, or

supervises something."  *Vandevender v. Blue Ridge of Raleigh, LLC*, 901 F. 3d 231, 237-8 (4th

Cir. 2018).  The court went on to define "condone" as to "forgive or overlook, or 'permit the

continuance of,'" stating that "[a] manger condones employees' actions when the manager is

aware of those actions and fails to intervene."  Regarding Defendant's operation, it is clear that

managers were involved in every aspect of the Defendant's use, research and eventual

discontinuation of the vermiculite, as well as being aware and condoning the activities that

occurred within the organization:

> CHILDRESS, GARY, (Page 74:3 to 74:22)
>                     74
> 3    Q.  Okay.  And so Mr. Chase was involved in that
> 4  decision.  Do you know anyone else that was?
> 5    A.  No, that wasn't what I said.
> 6      MS. GOLDEN:  I'm going to object that it misstates
> 7  prior testimony.
> 8      MR. HAMES:  Q. Okay, I'm sorry, I must have
> 9  misunderstood you, then.
> 10    A**.  Mr. Fronk.**
> **11    Q.  Mr. Fronk was involved in that decision.  Okay.**
> 12      Do you know anyone else that was involved in that
> 13  decision other than Mr. Fronk?
> 14    A.  I would assume that the general manager at that
> 15  time would have been**.  It being such a small organization.**
> **16  Nothing happens without the general manager's knowledge.**
> 17    Q.  Okay.  Do you know the names of any individuals
> 18  that were involved in that decision?

```
19      A.  I know the name of the general manager at that
20  time.
21      Q.  Who was it?
22      A.  Mike Vucavich.
```

See Exhibit 7, Deposition of Gary Childress, November 28, 2007.  Mr. Fronk, a decision maker

within the company, was also the person who received information from the vermiculite

suppliers regarding asbestos contamination.  He has served as a Corporate Designee of

Defendant and testified that his position was assistant general manager whose job responsibilities

included  "as a ceramic engineer I was in charge of quality control, engineering, method

improvements…." *Exhibit 8*, Deposition of Dale Fronk, May 8, 2008, pg. 7-8, 14.  In light of

this evidence, Plaintiff has provided sufficient evidence to create a question of fact for the jury as

to whether Defendant's conduct was willful and wanton, warranting imposition of punitive

damages.

## I.      CONCLUSION

For the foregoing reasons, Plaintiff Karen Cahoon, as Executrix of the Estate of Grace

Webster, deceased, respectfully requests this Court deny the Defendant Edward Orton, Jr. Ceramic

Foundation's Motion for Summary Judgment.

Respectfully submitted this 21st day of May, 2019.


/s/ Drew Sealey
Drew Sealey
Simmons Hanly Conroy
One Court Street
Alton, IL 62002
(618)259-2222
dsealey@simmonsfirm.com

/s/Janet Ward Black
Janet Ward Black NC Bar Number 12869
Ward Black Law

208 West Wendover Avenue
Greensboro, NC 27401
336-333-2244
Fax: 336-379-9415
jwblack@wardblacklaw.com

## **Certificate of Service**

I, Drew Sealey, hereby certify that a true and correct copy of the foregoing has been electronically

filed with the Clerk of the Court using the CM/ECF system which will send notification of such

filing to all parties of record.


/s/ Drew Sealey
Drew Sealey
Simmons Hanly Conroy
One Court Street
Alton, IL 62002
(618)259-2222
dsealey@simmonsfirm.com


/s/Janet Ward Black
Janet Ward Black
Ward Black Law
208 West Wendover Avenue
Greensboro, NC 27401
336-333-2244
Fax: 336-379-9415