EXHIBIT 3



**PohlmanUSA®**

Court Reporting and Litigation Services

---

# Mark G. Lawson

February 22, 2019

---

Grace Webster, Deceased, et al.

vs.

Edward Orton, Jr. Ceramic Foundation, et al.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NORTH CAROLINA

\* \* \*

KAREN CAHOON, AS EXECUTRIX
OF THE ESTATE OF GRACE WEBSTER,
DECEASED,

     Plaintiff,

     vs.            CASE NO. 2:17-CV-63-D

EDWARD ORTON, JR. CERAMICS
FOUNDATION, METROPOLITAN LIFE
INSURANCE COMPANY, and UNION
CARBIDE CORPORATION,

     Defendants.

\* \* \*

     Videotaped discovery deposition of MARK
G. LAWSON, Witness herein, called by the Plaintiff
for cross-examination pursuant to the Rules of
Civil Procedure, taken before me, Monica K. McBee,
a Notary Public in and for the State of Ohio, at
the Hilton Garden Inn, 8535 Lyra Drive, Columbus,
Ohio, on Friday, February 22, 2019, at 10:02 a.m.

\* \* \*

```
 1            EXAMINATIONS CONDUCTED       PAGE

 2    BY MR. SEALEY:.......................    5

 3    BY MS. DRAYTON:......................   65

 4    BY MR. SEALEY:.......................   67

 5

 6                EXHIBITS MARKED

 7    (Thereupon, Plaintiff's Exhibit

 8    No. 1, an eleven-page document

 9    titled Amended Notice To Take

10    Discovery Deposition, was marked for

11    purposes of identification.)..........   19

12    (Thereupon, Plaintiff's Exhibit

13    No. 2, a binder of documents, was

14    marked for purposes of

15    identification.).....................   32

16    (Thereupon, Plaintiff's Exhibit

17    No. 3, a document titled Affidavit,

18    was marked for purposes of

19    identification.).....................   42

20

21

22

23

24

25
```

1      (Thereupon, Plaintiff's Exhibit

2      No. 4, a four-page document titled

3      Supplemental Affidavit of Gary

4      Childress in Support of Defendant

5      Edward Orton Jr. Ceramic

6      Foundation's Motion to Dismiss

7      Plaintiff's First Amended Complaint,

8      was marked for purposes of

9      identification.)...................... 50

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES:

 2       On behalf of the Plaintiff:

 3
             Simmons Hanly Conroy
 4
         By:  Drew Sealey
 5            Attorney at Law
              One Court Street
 6            Alton, Illinois 62002
              (618) 259-2222
 7            dsealey@simmmonsfirm.com

 8       On behalf of the Defendants:

 9            Dean & Gibson, PLLC

10       By:  Amy C. Drayton
              Attorney at Law
11            301 South McDowell Street
              Suite 900
12            Charlotte, North Carolina 28204
              (704) 372-2700
13            adrayton@deanandgibson.com

14       ALSO PRESENT:

15            Steve Troncone, Videographer
              Gabriel A. Jackson
16
                          *   *   *
17

18

19

20

21

22

23

24

25
```

1           THE VIDEOGRAPHER:  We are now on the

2    video record.  Today is February 22nd, 2019.  The

3    time is approximately 10:02 a.m.  Will you please

4    raise your right hand to be sworn by the court

5    reporter?

6                MARK G. LAWSON

7    of lawful age, Witness herein, having been first

8    duly cautioned and sworn, as hereinafter

9    certified, was examined and said as follows:

10           MR. SEALEY:  This is plaintiff's

11   counsel, Drew Sealey, on behalf of Karen Cahoon.  I

12   just want to put one note on the record, that

13   counsel and I have agreed that we would limit

14   today's deposition to topics relating to

15   jurisdictional issues, and we reserve the right to

16   request that Mr. Lawson or someone else from Orton

17   be provided to cover topics beyond jurisdictional

18   issues down the road, should that become

19   necessary.

20                CROSS-EXAMINATION

21   BY MR. SEALEY:

22        Q.   All right.  Mr. Lawson, we met

23   just right before the deposition.  But, again,

24   my name is Drew Sealey, and I am an attorney

25   representing the plaintiff, Karen Cahoon, in

1    this case.  For the benefit of the record,

2    could you please state your full name?

3           **A.    Sure.  My name is Mark Griswold**

4    **Lawson.**

5           Q.    And that's L-A-W-S-O-N?

6           **A.    That's correct.**

7           Q.    Okay.  And, Mr. Lawson, you are

8    currently employed?

9           **A.    That is correct.**

10          Q.    And by who are you employed?

11          **A.    The Edward Orton, Jr. Ceramic**

12   **Foundation.**

13          Q.    Okay.  And I know I have referred

14   to them as Orton already.  But if I refer to

15   them as Orton, you will know who I am talking

16   about; is that fair?

17          **A.    That's fine.  It's a mouthful, so**

18   **Orton is fine.**

19          Q.    Okay, all right.  And, Mr. Lawson,

20   have you ever been deposed before?

21          **A.    No, sir, I have not.**

22          Q.    You have not.  Well, welcome.

23   It's a fun ride.  Do you have an understanding

24   then of why we are here today?

25          **A.    Yes, I do.**

```
 1          Q.   Okay.  And what is your

 2   understanding?

 3          A.   It's in relationship to a case

 4   where someone was exploring what information

 5   exists in terms of exposure to trace amounts of

 6   asbestos that were in some of the packaging

 7   materials that we used.

 8          Q.   Okay.  And before we get into that

 9   a little bit more, let me just go over some

10   ground rules for the deposition, since you

11   haven't been a party to one before.  If at any

12   time I ask a question that you don't understand

13   or doesn't make sense, which I am absolutely

14   going to do, please ask me to repeat it or

15   rephrase it, and I will be happy to do so,

16   okay?

17               Please try and remember to give

18   verbal answers for the court reporter's

19   benefit.  Obviously, a video can pick up shakes

20   of the head, but the transcript would not

21   reflect those.  So just yeses, nos, things of

22   that nature.

23               I don't know that I would ask you

24   to give me dimensions of anything.  But to the

25   extent that I would, rather than trying to
```

1    compare it to things in the room that we

2    couldn't see on the record, if you can just try

3    and do your best to approximate it or estimate

4    it.  Certainly, if I ask a question and you

5    give me an answer, I will assume that you

6    understood the question that was asked.

7         I don't think I am going to be

8    very long at all.  But if for any reason we

9    need to take a break, just let us know, and we

10   can do that.  Fair enough?

11        **A.    Fine.**

12        Q.    Okay.  Now, you understand that

13   you are here as a spokesperson on behalf of

14   Orton, correct?

15        **A.    Yes, sir.**

16        Q.    Okay.  So any time I refer to you,

17   I am referring to Orton, unless I -- not you

18   personally, but Orton as a corporation or a

19   foundation, unless I specify otherwise,

20   correct?

21        **A.    Yes, sir.**

22        Q.    Okay.  And I assume just one of

23   the perks of being a general manager is that

24   you get to come here and spend time with me

25   today.  So you are not being compensated

1     outside of your position as general manager for

2     the foundation, correct?

3          **A.   No, sir.**

4          Q.   Okay, what a perk that is.   Okay,

5     can you tell me first about your background?

6     How did you become the general manager of

7     Orton?

8          **A.   Through contact with the previous**

9     **general manager, Gary Childress.**

10         Q.   Okay.   Well, what is -- let's

11    start with your -- I just -- you don't have a

12    CV with you, by chance, do you?

13         **A.   No, I don't.**

14         Q.   If we could just kind of walk

15    through your history, since we haven't had the

16    benefit of reading any prior transcripts or

17    learning much about you, starting just kind of

18    with your educational background?

19         **A.   I have two engineering degrees and**

20    **a business degree.**

21         Q.   Okay.   And from where?

22         **A.   I have a engineering degree from**

23    **Virginia Polytechnic Institute.**

24         Q.   Okay.   When did you obtain that?

25         **A.   1982.**

PohlmanUSA Court Reporting
(877) 421-0099     PohlmanUSA.com
Case 2:17-cv-00063-D   Document 63-3   Filed 05/21/19   Page 10 of 85

```
 1          Q.   Okay.
 2          A.   And I have a master's in
 3   engineering from University of Pittsburgh.
 4          Q.   Okay.  And when did you obtain
 5   that?
 6          A.   1987.
 7          Q.   Okay.  And you said you have
 8   another degree?
 9          A.   I have a master's in business
10   administration from the University of Chicago.
11          Q.   Okay.  And when was that obtained?
12          A.   1993.
13          Q.   Okay, okay.  So you obtained your
14   engineering degree in '82, your master's of
15   engineering in '87, and then the MBA in '93?
16          A.   That's correct.
17          Q.   Okay.  Talk to me a little bit if
18   you would about your work history.  Did you --
19   when you graduated with an engineering degree
20   in 1982, did you go into the workforce?
21          A.   Yes, I did.  From 1982 to 1984 I
22   worked for a company called Eutectic Castolin.
23          Q.   You are going to have to help me
24   out with that.
25          A.   Okay.  Eutectic is
```

1    E-U-T-E-C-T-I-C.

2        Q.    Okay.

3        A.    And Castolin is C-A-S-T-O-L-I-N.

4        Q.    What did Eutectic Castolin do?

5        A.    They made welding, soldering, and

6    aware protection products.

7        Q.    What are aware protection

8    products?

9        A.    Where you have parts or surfaces

10   that degrade due to abrasion.

11       Q.    Okay.

12       A.    Trying to make them more

13   resilient.

14       Q.    Okay.  So you did that for about

15   two years.  Then did you go to graduate school

16   full-time?

17       A.    That's correct.

18       Q.    So from '84 to '87 you were

19   getting your master's?

20       A.    That's correct.

21       Q.    Okay.  And then when you graduated

22   with your master's in '87, did you --

23       A.    Then I went and worked for the

24   Institute of Gas Technology.

25       Q.    Okay.  Where was that?

1          A.    Chicago, Illinois.

2          Q.    Okay.  And I should have asked

3     you, where was Eutectic Castolin located?

4          A.    Flushing, New York.

5          Q.    Okay.  What was your role with the

6     Institute of Gas Technology in Chicago?

7          A.    Materials engineer.

8          Q.    Okay.  Any specific materials?

9          A.    A pretty wide range of materials.

10    I have worked in a lot of materials.  But

11    primarily, the -- primarily on materials in a

12    molten carbonate fuel cell, which are primarily

13    lithium aluminate, nickel, nickel oxide.

14         Q.    Okay.  And how long did you work

15    for the Institute of Gas Technology?

16         A.    I believe about four years.

17         Q.    Okay.  Were you doing -- did you

18    start then getting your MBA in conjunction with

19    that, or did you get your --

20         A.    Right.  The balance of my

21    education was while I was working after my

22    bachelor's.

23         Q.    Okay.  So in approximately 1991 or

24    '92, where did you go to work?

25         A.    Okay.  I believe you skipped a

1    job.

2              Q.    Well, okay.  You said --

3              A.    If you want to, that's fine.

4              Q.    No, no, no, no, no.  You said you

5    worked for the Institute of Gas Technology for

6    about four years starting in '87, correct,

7    after you received your master's?

8              A.    Wait, let me make sure I don't get

9    confused here.

10             Q.    I promise I am not trying to trick

11   you.

12             A.    No, that's all right.  I started

13   in 1986.  I graduated in '87, but that's

14   because I defended my thesis after I started

15   work.

16             Q.    Okay.

17             A.    Then I worked there till 1990.

18             Q.    Okay.

19             A.    Then from 1990 to 1995 -- from

20   1990 to 1995, I went to Elkay Manufacturing.

21             Q.    Can you spell that?

22             A.    E-L-K-A-Y.

23             Q.    And what was your role with Elkay

24   Manufacturing?

25             A.    Once again, materials engineer.

1          Q.   Okay.  The same type of materials?

2     A wide range that --

3          **A.   Some overlap, but more metals,**

4     **less ceramics.**

5          Q.   And where did you go after you

6     left Elkay?

7          **A.   Okay.  So from 1995 to 1999, I**

8     **went to work for Senior Flexonics.**

9          Q.   Where was that located?

10          **A.   A suburb of Chicago, Bartlett,**

11     **Illinois.**

12          Q.   I am familiar.  And what did you

13     do for Senior Flexonics?

14          **A.   Director of engineering.**

15          Q.   What type of things was Senior

16     Flexonics producing?

17          **A.   Automotive parts in the division**

18     **that I was working in.**

19          Q.   Okay.  What types of automotive

20     parts?

21          **A.   Principally, exhaust system**

22     **components and air pollution reduction**

23     **components, some heat exchangers.**

24          Q.   Okay.  And then in '99, what came

25     next?

```
 1         A.    Okay.  So from then '99 to 2011 --

 2         Q.    Okay.

 3         A.    -- I went back to Elkay again.

 4         Q.    Okay.  Did your role change?

 5         A.    Vice president of -- or no,

 6   director of engineering, pardon me.

 7         Q.    So you made them feel the pain for

 8   four years, then you went back, huh?

 9         A.    They called me and made me an

10   offer I couldn't refuse.

11         Q.    All right, so another twelve years

12   with them.  And then where did you go in 2011?

13         A.    Okay.  Then 2011, I went -- from

14   1999 to 2011 -- or no, from 2011 to 2013 --

15         Q.    Okay.

16         A.    I apologize, from 2011 to 2013, I

17   went to work for a medical device company.

18         Q.    What were you doing for them?

19         A.    Supply chain leader.

20         Q.    What was the name of the company?

21         A.    Trigon International.

22         Q.    And then in 2013?

23         A.    Then from -- in 2013, I went to

24   work for Tervis, T-E-R-V-I-S.

25         Q.    The cup company?
```

1          A.    The cup company; that's correct.

2          Q.    Okay, I love Tervis.  They were

3    great until Yetis took over.  Is that why --

4    don't tell me that's why you left.

5          A.    No, that's not why I left.

6          Q.    How long did you work for Tervis?

7          A.    About four years, so that would

8    have been what --

9          Q.    About 2017?

10         A.    Right.

11         Q.    What did you do for Tervis?

12         A.    2013 to 2017.  Senior vice

13   president of engineering.

14         Q.    And where is that?

15         A.    It's in Venice, Florida.

16         Q.    Were you living in Florida or were

17   you living somewhere else?

18         A.    I was living in Florida.

19         Q.    And you came back to Columbus?

20         A.    Yes.

21         Q.    A day like today, that's a really

22   good decision.  Okay.  So in 2017, where did

23   you go?

24         A.    2017, I worked as a consultant for

25   small businesses through the Small Business

1    Administration.  I did that for a year.

2         Q.   Okay.  What type of businesses

3    were you consulting?

4         A.   Primarily, manufacturing.

5         Q.   Was that still in Florida?

6         A.   Yes.

7         Q.   It was after that when you got

8    sucked into the Edward Orton Ceramic

9    Foundation?

10        A.   In January of last year, 2018, I

11   came up fourteen months ago, I guess, to the

12   Edward Orton Jr. Ceramic Foundation.

13        Q.   Okay.  So you have been -- have

14   you been in the role as general manager since

15   you started working for Edward Orton?

16        A.   Yes, sir.

17        Q.   Okay.  So you have been with the

18   company for about fourteen months, you said?

19        A.   Approximately, slightly less.

20        Q.   Okay, all right.  And Orton is

21   obviously in the business of manufacturing

22   pyrometric cones, correct?

23        A.   We have three businesses, that's

24   one of our businesses.

25        Q.   Okay.  What are the other two?

```
 1            A.    Materials testing.

 2            Q.    Okay.  Tell me what that means.

 3            A.    We do all different tests of

 4     materials for all different companies primarily

 5     centered around the high temperature properties

 6     of materials.  So we measure all different

 7     properties and then report back to different

 8     industries what the properties of their

 9     materials are and how they react, especially at

10     high temperature.

11            Q.    Okay.  And how long has that been

12     a division of Edward Orton?

13            A.    My knowledge is limited to that we

14     were doing that back in the early '60s.  I

15     don't know the exact date of when it started.

16            Q.    Okay, so you are performing a

17     service for various companies around.  Is it

18     limited to the United States or beyond?

19            A.    No, we have done business I think

20     in seventy different countries besides the US,

21     continue to have international business.

22            Q.    Okay.  So one division is the

23     manufacture and sale of pyrometric cones, one

24     division is materials testing, and you said

25     there is a third division?
```

1          A.    We build the test instruments and

2    sell the test instruments to our customers as

3    well.   So we give them the choice of doing the

4    testing themselves, or we do the testing for

5    them.

6          Q.    Okay.   Did you bring anything with

7    you today relative to your testimony?

8          A.    No, sir.

9          Q.    Okay.   Why don't we --

10          MR. SEALEY:   I am going to just run

11    this up there.   This is what I just showed you,

12    Amy.   Can you just mark that as Exhibit 1?

13          (Thereupon, Plaintiff's Exhibit

14    No. 1, an eleven-page document titled Amended

15    Notice To Take Discovery Deposition, was marked

16    for purposes of identification.)

17    BY MR. SEALEY:

18          Q.    I am just going to hand that to

19    you, sir.

20          A.    Thank you.

21          Q.    If you wouldn't mind taking a

22    look.   Have you seen -- have you seen that

23    document before?

24          A.    Yes, I have.

25          Q.    Okay.   And that's just a notice

1    for today's deposition.  But what is the first

2    time you can recall seeing that document?

3             **A.    The day before yesterday.**

4             Q.    Okay.  If you wouldn't mind --

5    your counsel and I have spoken and we have

6    agreed to limit today's deposition to just

7    certain of the delineated items that were

8    requested in that deposition notice.

9             If you wouldn't mind just opening

10   that for a second, I just put a highlight over

11   the numbers that we have agreed to, starting --

12   I believe it starts with number one.

13            MS. DRAYTON:  The third or fourth

14   page there, Mark.

15            THE WITNESS:  Okay, I see that.  Let

16   me check the third page here, make sure I see them

17   all.  Okay, got it.

18   BY MR. SEALEY:

19            Q.    So are you the person that's most

20   knowledgeable --

21            **A.    Yes, sir.**

22            Q.    -- with respect to the items

23   delineated there?  Okay.  I assume that we can

24   agree based on the fact that you have been

25   working for Orton for just shy of fourteen

1   months that anything you are testifying here to

2   today is not based on direct personal

3   knowledge?

4          **A.    I would say anything that happened**

5   **during the time period that we are examining --**

6          Q.   Fair enough.

7          **A.    -- couldn't be.**

8          Q.   Anything that's occurred prior

9   to --

10         **A.    I am not trying to be evasive.**

11         Q.   No, no.

12         **A.    I am just trying to make sure I**

13  **answer your question accurately.**

14         Q.   You are being a good witness.

15  Prior to 2000 -- anything that you are

16  testifying to that happened prior to 2018 would

17  not be based on your direct personal knowledge,

18  correct?

19         **A.    That's correct.**

20         Q.   Okay.  Any knowledge that you have

21  acquired has been through talking to other

22  sources, other employees, reviewing documents,

23  et cetera?

24         **A.    That's correct.**

25         Q.   Okay, fair enough.  What have you

1    done to prepare for today's deposition?

2         **A.    Well, I have done a lot over the**

3    **last fourteen months just not to prepare**

4    **specifically for this deposition but to learn**

5    **as much as I possibly could to be able to give**

6    **an accurate account of what the extent of our**

7    **knowledge is of the events that occurred and**

8    **the information that was available during the**

9    **time all these things happened.**

10        Q.    Okay.

11        **A.    So I have done numerous things to**

12   **try to learn about the history and in**

13   **particular what documentation we have and what**

14   **was done in regard to handling vermiculite.**

15        Q.    Okay.  So what types of things

16   have you done?

17        **A.    I have read everything that I**

18   **could get my hands on that looked like it**

19   **was -- may have any relationship to our**

20   **treatment of packing materials over those**

21   **years.**

22        Q.    Okay.

23        **A.    I have sought out and reviewed any**

24   **documents I could find, and then I spent a lot**

25   **of time interviewing Gary Childress, the**

1    previous general manager, and I have talked to

2    long-term employees, basically not all at once.

3            Q.   Sure.

4            A.   But as time progresses, I try to

5    learn more and more and about the history of

6    the company in general, so I think that -- that

7    probably covers it.

8            Q.   Okay.  Well, guess what?  The

9    history of the company has been beat to death,

10   so I am not going to quiz you on that.

11              MS. DRAYTON:  Good news.

12   BY MR. SEALEY:

13           Q.   So we will spare you that

14   headache.  You said you sought documents.

15   Where would you go to seek documents?

16           A.   Well, the principal thing I did

17   is -- and it's widely been disclosed -- that we

18   have a document cage on a mezzanine.

19           Q.   Okay.

20           A.   So I'm the type of person that

21   likes to see things instead of saying that

22   someone else told me something.  So even though

23   all those documents have been gone over

24   numerous times, I went up and --

25           Q.   Locked yourself in the cage?

1          **A.    -- tried to open every single box**

2    **of every document in the cage so that I would**

3    **know -- see firsthand what I was talking about.**

4          Q.    Fair enough.  You indicated that

5    you also interviewed Gary Childress

6    extensively.  You guys obviously have a

7    personal relationship if he was the one that

8    recruited you to --

9          **A.    We have an ongoing relationship.**

10         Q.    When did you first --

11         **A.    He is a mentor of mine.**

12         Q.    When did you first meet Gary?

13         **A.    To my best memory, that would have**

14   **been December of 2017.  We had talked on the**

15   **phone prior to that.**

16         Q.    Have you read any prior

17   transcripts of Gary's deposition transcripts?

18         **A.    Depositions?**

19         Q.    Yeah.

20         **A.    I have made an attempt to review**

21   **all the available transcripts of depositions.**

22         Q.    It's like reading a Grisham novel,

23   isn't it?  It keeps your attention.  It's real

24   nailbiters.  Okay, and you said you talked with

25   some former employees.  Can you identify for me

1    what former employees you have spoken with to

2    gather knowledge?

3           A.    **No former employees, present,**

4    **long-term employees.**

5           Q.    Who would those be?

6           A.    **Well, the principal one, the**

7    **longest tenured one would be Jim Litzinger.**

8           Q.    Who is Jim Litzinger?  What does

9    he do with the company?

10          A.    **He is the business manager.**

11          Q.    Do you know how long he has been

12   with Orton?

13          A.    **Yes, he is the longest tenured**

14   **employee.  He started in 1990.  So that would**

15   **be twenty-six years.**

16          Q.    It would be twenty-nine years.

17          A.    **Twenty-nine years, pardon me.  You**

18   **got me.**

19          Q.    It's not a math test.  I thought

20   you were an engineer, okay.  Any other

21   employees?

22          A.    **Well, we are a small company, so I**

23   **talked to everybody, but --**

24          Q.    Fair enough.  Is there anybody

25   else you would defer to in terms of --

1        A.    Tom McInnerny.  He is fairly

2   knowledgeable about things.

3        Q.    How would you spell that last

4   name?

5        A.    I believe it's M-C-I-N-N-E-R-Y.

6        Q.    Okay.  What is --

7        A.    But I am not sure I have the right

8   number of N's.

9        Q.    There could be four.  What is

10  Tom's role with the foundation?

11       A.    He is an engineer.

12       Q.    Okay.  And do you know how long he

13  has been with them, with you?

14       A.    No, I can't recall.

15       Q.    Okay.  Anybody else?

16       A.    Less than Jim, I know that.

17       Q.    Fair enough.  Anyone else?

18       A.    Those are the two people I'd

19  primarily go to when I have any question about

20  anything that's related to packaging materials

21  in the past.

22       Q.    Okay, fair enough.  So you have

23  spent obviously the last year-plus just kind of

24  reviewing anything you can get your hands on,

25  it sounds like.  Specifically as it relates to

1    the case that we are here for today, have you

2    reviewed any documents related to -- to this

3    case, the deposition transcript or anything

4    like that?

5         **A.    Yes.**

6         Q.    Okay.  Any other documents?

7         **A.    Well, this document in particular**

8    **that you have already given me in terms of what**

9    **it covered and what I am responsible for.**

10         Q.    Okay.  So you read the dep -- or

11   the deposition notice.

12              MS. DRAYTON:  Let me just interject,

13   Drew.  When you said deposition transcript, what

14   transcript are you referring to?

15              MR. SEALEY:  Karen, Karen Cahoon's

16   transcript.

17              MS. DRAYTON:  That's what I thought.

18              THE WITNESS:  I am sorry.

19              MS. DRAYTON:  He is asking the

20   plaintiff, Ms. Cahoon, have you reviewed that?

21              THE WITNESS:  No, I have not.  I have

22   not seen that, I apologize.

23   BY MR. SEALEY:

24         Q.    Okay.  Any other documents that

25   relate specifically to this deposition -- or I

1    am sorry, to this case that you have reviewed

2    for today's deposition?

3         **A.    Not that I can recall.**

4         Q.    Okay, okay.  You have already

5    alluded to the infamous cage, so I wanted to

6    talk to you a little bit more about that.  Does

7    Orton today -- is there a document retention

8    policy that Orton keeps?

9         **A.    Yes.**

10        Q.    Okay.  And what is that policy?

11        **A.    Our -- our policy is for**

12   **accounting information.  We retain it for seven**

13   **years.**

14        Q.    Okay.

15        **A.    And that's generally accepted and**

16   **also to try to comply with the IRS as well.**

17        Q.    Sure, okay.  What about other

18   documents or materials?

19        **A.    It depends on the document, the**

20   **type of the document.  We are an ISO company,**

21   **so we actually have a two-page matrix of how**

22   **long we keep certain kinds of documents.  And**

23   **the times specified are the minimum amount of**

24   **time we will hold those documents.**

25             **And, like I said, there's two**

1    pages.  But I did review that, and none of

2    those are in excess of seven years.  Some of

3    them are less than seven years.

4         Q.   Okay.  So seven years is the max?

5         A.   It's the max we guarantee.  We

6    will hold them no less than that period of

7    time.

8         Q.   Fair enough.  Tell me about the

9    cage.  Is this where all Orton documents are

10   stored, historical documents?

11        A.   I wouldn't say that.  I mean, I

12   have a couple historical documents in my

13   office.

14        Q.   Okay.

15        A.   So -- but they are -- most of them

16   are related to Standard Pyrometric Cone

17   Company, which is pre-1932.

18        Q.   Okay.

19        A.   There are also some of those

20   historical type documents at Ohio State.  So I

21   would not say all the documents are in that

22   cage.

23        Q.   Fair enough.

24        A.   That wouldn't be accurate.

25        Q.   Are the documents that you

1    reference at Ohio State based on pre-1932?

2         A.   I don't know that they are all

3    pre-1932, but they are historical in nature.

4         Q.   Okay.

5         A.   So the bulk of them would be

6    during Edward Orton's lifetime.

7         Q.   Fair enough.

8         A.   Many of them are handwritten

9    documents by Edward Orton, and he died in 1932.

10        Q.   Okay.

11        A.   So that would corroborate that the

12   bulk of them are, but I cannot say that all of

13   them are.

14        Q.   Fair enough.  What documents --

15   well, strike that, let me back up.  Where is

16   this mezzanine or this cage that you have

17   talked about?

18        A.   It's -- it's a mezzanine.  It's a

19   second story mezzanine, so it's off the

20   production area.  And it's between the office

21   and shipping and receiving as you walk out of

22   the office towards the -- the shop area.

23        Q.   Okay.  So it's in the Orton

24   headquarters?

25        A.   We only have one location.

```
 1            Q.   So it's in the Orton location?
 2            A.   Yeah.  So I guess by definition,
 3      everything is at our headquarters.
 4            Q.   Okay.  You don't have any other
 5      document storage facility off site?
 6            A.   I am not aware that we have any
 7      facility to store anything off site.
 8            Q.   Okay.  This area itself where
 9      these documents are stored, can you estimate
10      for me approximately how big it is?
11            A.   Okay.  So in round numbers?
12            Q.   Sure.
13            A.   Sixteen by twenty.
14            Q.   Okay.
15            A.   That's an estimate.
16            Q.   Sure.
17            A.   Sixteen feet by twenty feet, I'm
18      sorry.
19            Q.   And what is actually in this
20      space, are there filing cabinets, drawers,
21      what --
22            A.   There is a lot of metal shelves,
23      some of which are empty, and a lot of -- a few
24      metal filing cabinets.  Some are empty, and
25      some are not.
```

1          Q.   Do you have any idea as to the

2   number of documents that are stored there?

3          **A.   No, I don't.**

4          Q.   Fair enough.  You didn't lock

5   yourself in there and count them one day, did

6   you?

7          **A.   No.**

8          Q.   Let's talk about --

9               MR. SEALEY:  I am trying to figure out

10  the best way to do this because it's eight hundred

11  and fifty-five pages of documents.  There were

12  documents that were produced to us in this case

13  that I want to mark as Exhibit 2.

14               But what I think I want to do,

15  Monica, is we will try to provide an electronic

16  copy of these so as not to burden you and/or

17  anyone in the copying of all these documents.

18  BY MR. SEALEY:

19          Q.   I am going to come up, and I am

20  going to hand these to you.  And I only brought

21  one copy because, of course, again, there is a

22  lot of pages.

23               (Thereupon, Plaintiff's Exhibit

24  No. 2, a binder of documents, was marked for

25  purposes of identification.)

1    BY MR. SEALEY:

2         Q.   I am going to hand this to you,

3    sir, if you wouldn't mind.

4         **A.   Thank you.  I am going to move**

5    **this glass so I don't break anything.**

6         Q.   Oh, sure.

7         **A.   Especially not on tape.**

8         Q.   Okay.  No getting out of that one.

9    Okay.  Those were documents that were produced

10   to us in this case.  And first of all, I guess,

11   have you seen those documents before?

12        **A.   Yes, sir.**

13        Q.   Okay.  I know you haven't had a

14   chance to thumb through all eight hundred and

15   fifty-five pages.  But based on your quick

16   review, do those appear to be true and accurate

17   copies of what was provided to us by your

18   counsel?

19        **A.   Yes, these are documents that we**

20   **have disclosed that we refer to as the cash**

21   **receipt journals.**

22        Q.   Okay, you just answered my next

23   question.  And as you may or may not be aware,

24   these documents have never been produced in

25   litigation before, so I just want to ask you a

1    little bit more about them, at least that I am

2    aware of.  Where were these documents

3    uncovered?

4         **A.   Okay.  To my knowledge, all of**

5    **these documents were discovered in the cage,**

6    **but there were copies of a portion of these**

7    **documents where I got -- when I -- when I first**

8    **got there, and I cannot trace exactly where**

9    **they got that portion of the cash receipt**

10   **journals and made copies of them.**

11        Q.   I am not sure I follow.  So these

12   were in the cage, but they had never before

13   been seen or looked at?

14        **A.   Okay.  When I got to Orton, they**

15   **had a portion of the cash receipt journals.**

16        Q.   Okay.

17        **A.   When I went in the cage, as I**

18   **disclosed to you earlier --**

19        Q.   Yeah.

20        **A.   And I know the date because I kind**

21   **of was surprised to find the documents, so I**

22   **said I had better keep track of how this**

23   **happened.**

24        Q.   Okay.

25        **A.   It was August 29th of 2018.**

1    Q.   Okay.

2        **A.   That was the day I described that**

3   **I went in and I looked at all the documents.  I**

4   **found additional years of the cash receipt**

5   **journals.**

6    Q.   Okay.  So you personally found

7   these?

8        **A.   Right.**

9    Q.   Okay.  You mentioned years --

10       **A.   So those particular ones came from**

11  **the cage.**

12   Q.   Okay.  You reference some other

13  cash receipt journals that you knew to have

14  existed before then for certain years.  What

15  years were those?

16       **A.   I can't -- I know the span of**

17  **years, but I can't remember which years were**

18  **there when I got there and which years I found.**

19   Q.   What is the span of years that

20  exists for these cash receipt journals?

21       **A.   They run from 1963 --**

22   Q.   Okay.

23       **A.   And now I am having a memory**

24  **lapse, I believe 1985.**

25   Q.   Okay.  And to the best of your

1    knowledge, these were documents that were made

2    at or around the time that this business was

3    conducted?

4           **A.    They were handwritten.  They were**

5    **dated.**

6           Q.    Okay.

7           **A.    I would be assuming, you know, if**

8    **that's --**

9           Q.    That's the case?

10          **A.    Yeah.**

11          Q.    Do you know who was responsible

12   for keeping those cash receipt journals?

13          **A.    No.**

14          Q.    Okay.  Do you know if it was a --

15   not necessarily by name, but was it somebody in

16   the accounting department?  Was it a general

17   manager, or you just don't know?

18          **A.    I would be -- I would be assuming,**

19   **so --**

20          Q.    Okay, fair enough.  A safe

21   assumption that they were made by somebody who

22   had specific knowledge of the transactions that

23   were taking place?

24                 MS. DRAYTON:  Objection.

25                 THE WITNESS:  That's a reasonable

1    conclusion.

2    BY MR. SEALEY:

3         Q.   To the best of your knowledge,

4    they were -- they were kept in the ordinary

5    course of business?

6         **A.   To the best of my knowledge.**

7         Q.   Okay.  Are there any more

8    documents like this that you are aware of that

9    have been found but have not yet been produced?

10        **A.   No.**

11        Q.   There are documents, though, based

12   on your belief because we were produced

13   documents I believe in 1973 or '74 that go all

14   the way back to 1963, you believe?

15        **A.   Can you please repeat your**

16   **question?**

17        Q.   Sure.  The documents that I put in

18   front of you -- and I think you can probably

19   see there at the top the first month and year,

20   which is -- I am sorry, I don't have that in

21   front of me.  Can you read that to us?

22        **A.   1974.**

23        Q.   Okay.  So it's your testimony that

24   there are documents from -- like these that go

25   from 1963 until 1974?

```
 1          A.    Yes.
 2          Q.    Okay.  But based on your knowledge
 3   outside of what is sitting there in front of
 4   you that spans from 1974 until approximately
 5   1985 and then what goes from 1963 to 1974 that
 6   we have not seen, there are no other cash
 7   receipt ledgers?
 8          A.    That is correct.
 9          Q.    So what would you say is the
10   information that's contained in those cash
11   receipt journals?
12          A.    Generally, it tends to be the
13   date, the name of what appears to be a
14   distributor or a reseller, and then some amount
15   of -- of money.  That's the general nature.
16          Q.    Okay.  Are those cash receipt
17   journals still kept in the regular course of
18   business today?
19          A.    No, sir.
20          Q.    In a much more advanced form, I am
21   sure?
22          A.    We have computers.
23          Q.    Do you know why the cutoff in
24   1985?  Did the system become automated or --
25          A.    I would be speculating.
```

1     Q.   Okay.  So it's your belief that

2   these cash receipt journals reflect

3   distributors or resellers of Orton pyrometric

4   cones, correct?

5     **A.   That seems like a reasonable**

6   **assumption to me.**

7     Q.   Do you know if the information

8   came -- strike that.  Do you know if the

9   information contained in those cash receipt

10  journals is exhaustive?

11        MS. DRAYTON:  Objection, form.

12        THE WITNESS:  I can't verify that.  I

13  have no way of knowing that.

14  BY MR. SEALEY:

15     Q.   Okay.  Is there anyone who does or

16  who would?

17     **A.   I don't believe so.**

18     Q.   And certainly you don't know the

19  particulars of any of those transactions

20  contained in those cash receipt journals,

21  correct?

22     **A.   No, sir.**

23     Q.   Okay.  Is there anyone who would?

24     **A.   No, sir.**

25     Q.   And I should ask a better

1  question, is there anyone from Orton who would

2  know the particulars of those transactions?

3          **A.    And I should have said not to my**

4  **knowledge.  It's possible there could be, but**

5  **not to my knowledge.**

6          Q.    Okay.  You don't know of some

7  accountant from 1976 that is still around who

8  was keeping those journals?  Let's put it that

9  way.

10         **A.    No, sir.**

11         Q.    Okay.  Have you had a chance to

12  review the entries in those cash receipt

13  journals?

14         **A.    Not in totality.**

15         Q.    Okay.  Are you aware that there

16  are entries in those cash receipt journals that

17  reflect the sale of Orton pyrometric cones to

18  Ceramics By Stu-Doodle?

19         **A.    Yes, sir.**

20         Q.    Are you aware that there has been

21  testimony provided in the case we are here for

22  today, the case of Karen Cahoon, that Ceramics

23  By Stu-Doodle is located in Elizabeth City,

24  North Carolina?

25         **A.    I am not aware of that testimony,**

1    no.

2         Q.   I will represent to you based on

3    the testimony of Karen Cahoon that there is a

4    ceramics -- there was a ceramics supply store

5    in Elizabeth City, North Carolina, by the name

6    of Ceramics By Stu-Doodle.  Are you aware of

7    any other Ceramics By Stu-Doodle distributors

8    or resalers that Orton supplied cones to?

9         **A.   Please repeat the question.**

10        Q.   Sure.  Are you aware of any other

11   suppliers or resellers of Orton pyrometric

12   cones by the name Ceramics By Stu-Doodle other

13   than the one that's been identified in this

14   case in Elizabeth City, North Carolina?

15        **A.   The only reference I know to**

16   **Stu-Doodle is in these journals, these cash**

17   **receipt journals that have been disclosed and**

18   **appear to be here in front of me.  I know of no**

19   **other.**

20        Q.   So you have no information or

21   testimony to contradict the assertion by Karen

22   Cahoon that she and her mother purchased Orton

23   pyrometric cones from Ceramics By Stu-Doodle in

24   Elizabeth City, North Carolina?

25        **A.   I am sorry, can you repeat the**

1    **question?**

2              MR. SEALEY:  Can you read that back,

3    please?

4              (Question read.)

5              MS. DRAYTON:  Objection to form,

6    lacks foundation.

7              THE WITNESS:  No.

8              (Thereupon, Plaintiff's Exhibit

9    No. 3, a document titled Affidavit, was marked for

10   purposes of identification.)

11   BY MR. SEALEY:

12        Q.   I am going to hand that to you,

13   sir.  Mr. Lawson, if you wouldn't mind just

14   taking a peek at that document.  Have you ever

15   seen that document before?

16        **A.   I don't recall seeing this**

17   **document.**

18        Q.   Okay.  And I will represent to

19   you, that's an affidavit that's been presented

20   to us in this case of a former employee of

21   Ceramics By Stu-Doodle in Elizabeth City, North

22   Carolina.

23             And if you would go down to

24   paragraph four there, it says Ceramics By

25   Stu-Doodle sold Orton pyrometric cones which

1    were purchased directly from Orton on a regular

2    and continuous basis during my employment.  Did

3    I read that correctly?

4         **A.    Yes.**

5         Q.    Okay.  And paragraph two says I

6    was employed by Ceramics By Stu-Doodle from

7    approximately 1974 to 1984.  Did I read that

8    correctly?

9         **A.    Yes.**

10         Q.    Do you have any information or

11    testimony that would contradict the assertions

12    made by Elaine Garrett in this affidavit?

13         **A.    If I am following the logic of**

14    **this document correctly, the cash receipt**

15    **journals indicate that we only sold cones to**

16    **Stu-Doodle from 1978 through 1980.  So I think**

17    **that could be interpreted as contradicting**

18    **this.  But there is a lot of interpretation, so**

19    **I am not -- I am not a lawyer, so I don't know.**

20         Q.    Okay, fair enough.  Well, you

21    would agree with me that the evidence in the

22    cash receipt journals corroborates at least for

23    some period of time the sale of Orton

24    pyrometric cones to Ceramics By Stu-Doodle in

25    Elizabeth City, North Carolina, correct?

1            MS. DRAYTON:  Objection to form,
2     unlimited as to time or scope.
3            THE WITNESS:  Okay.  I would point
4     out that the cash receipt journals only indicate
5     the receipt of money and also that we sold other
6     products besides pyrometric cones.  So I don't
7     think you can from the cash receipt journal
8     conclude which products were paid for.
9     BY MR. SEALEY:
10           Q.   Okay.  What other --
11           **A.   Or services.  So I can't say based**
12    **on my interpretation of the information that's**
13    **available.  Was that clear?**
14           Q.   Not really, but we will get into
15    that.
16           **A.   Okay.**
17           Q.   You would agree with me that those
18    cash receipt journals reflect the sale of
19    ceramics -- reflect the sale of goods to
20    Ceramics By Stu-Doodle in Elizabeth City, North
21    Carolina?
22           **A.   Goods or services, yes.**
23           Q.   And the only other good or service
24    that Orton provided was, as you have talked
25    about a little bit earlier, materials testing

1    or equipment to conduct materials testing?

2          A.    Materials testing and the

3    instruments, but the description of the three

4    businesses did not cover our entire product

5    line.

6          Q.    What other products does Orton

7    sell?

8          A.    And our product line at that time,

9    we had additional products that we do not have

10   now.

11         Q.    Which were what?

12         A.    Okay.  So what you referred to as

13   the cone business we refer to as products for

14   firing.

15         Q.    Okay.

16         A.    So products that we have sold and

17   some of which we presently still sell within

18   that business include things like gloves,

19   goggles, kiln vents which draw air out of a

20   cooling kiln.

21         Q.    Okay.

22         A.    What is broadly referred to as

23   kiln furniture --

24         Q.    Okay.

25         A.    -- to position support for a

1    variety of products being fired in a kiln.

2           Q.   Okay.

3           A.   So I cannot tell from these dollar

4    amounts what was being purchased.

5           Q.   Are you aware if Ceramics By

6    Stu-Doodle in Elizabeth City, North Carolina,

7    ever purchased gloves, products, kiln, or kiln

8    furniture?

9           A.   No, I am not.

10          Q.   Okay.  And I believe you were

11   trying to follow the logic of the affidavit.

12   Do you see anything in Elaine Garrett's

13   affidavit that references the purchase of

14   gloves, goggles, kiln vents, or kiln furniture?

15          A.   No, I do not.

16          Q.   Okay.  In fact, the only thing

17   referenced in Elaine Garrett's affidavit are

18   Orton pyrometric cones, correct, paragraph

19   four?

20          A.   That's all I see here on this

21   document.

22          Q.   Does Orton advertise nationally?

23               MS. DRAYTON:  Objection to form and

24   limited as to time or scope.  You can answer.

25               THE WITNESS:  Okay.  Orton primarily

1    has advertised -- had print advertisement in

2    industry publications.

3    BY MR. SEALEY:

4         Q.   You say they always have, to the

5    best of your knowledge?

6              MS. DRAYTON:  Objection to form.

7              THE WITNESS:  Yeah, I can't say

8    always, but...

9    BY MR. SEALEY:

10        Q.   From 1970 -- strike that.  From

11   1963 to the present, would that be true?

12        **A.   I don't know if it's been every**

13   **year, but directionally, yes.**

14        Q.   Does Orton limit their sales to

15   certain geographic regions or will they sell

16   anywhere?

17             MS. DRAYTON:  Objection as to time

18   period and limited scope.

19             THE WITNESS:  I am not aware of us

20   excluding selling to any particular geographic

21   region.

22   BY MR. SEALEY:

23        Q.   And is that true dating back until

24   1963, to the best of your knowledge?

25        **A.   To the best of my knowledge.**

1    Q.   Okay.  Orton understands that they

2  are not always selling to end users, correct;

3  that you would be selling to resellers or

4  distributors who would then be selling to end

5  users, fair?

6    **A.   I would classify our model as a**

7  **business to business model in that we sell**

8  **through distribution.**

9    Q.   Okay.  Has that always been the

10  case?

11    **A.   It has always been the primary**

12  **business model.  But in previous depositions**

13  **Gary Childress, the previous general manager we**

14  **have discussed before --**

15    Q.   Sure.

16    **A.   -- has said there have been**

17  **incidents of a local person stopping by and**

18  **picking up cones and paying for them at our**

19  **only location here in the Columbus -- greater**

20  **Columbus area.**

21    Q.   Fair enough, fair enough.

22    **A.   So I can't say a hundred percent**

23  **of the time every single item that's been sold**

24  **has gone through distribution, but that's our**

25  **primary business model.**

1          Q.   So the expectation is that Orton

2     would sell to a company like Stu-Doodle for

3     customers to come in and buy their product; is

4     that fair?

5          **A.   To me, when you say a company like**

6     **Stu-Doodle, that's kind of a broad statement.**

7          Q.   A ceramics supply store?

8          **A.   I believe we sell through**

9     **industrial distributors as well that I would**

10    **not classify as a ceramics supply store.  So I**

11    **-- I think that's too broad of a statement.**

12         Q.   But Orton did sell products to

13    ceramics supply stores --

14         **A.   Certainly.**

15         Q.   -- with the expectation that

16    customers could come purchase their products

17    from those ceramics supply stores?

18         **A.   That is correct.**

19         Q.   And, in fact, your website lists

20    two or three at least, I believe, distributors

21    presently in the state of North Carolina; is

22    that correct?

23         **A.   I believe there are three at the**

24    **present time.**

25         Q.   Do you know how long those three

1    companies have been distributors for Orton?

2         **A.    To my recall of our documents, the**

3    **earliest one was enlisted as a distributor or a**

4    **reseller in 1999 of the three.**

5         Q.   Okay.  You said '99, correct?

6         **A.    That is correct, 1999.**

7         Q.   Okay.  One more thing to show you,

8    I think, I promise.

9              (Thereupon, Plaintiff's Exhibit

10   No. 4, a four-page document titled Supplemental

11   Affidavit of Gary Childress in Support of

12   Defendant Edward Orton Jr. Ceramic Foundation's

13   Motion to Dismiss Plaintiff's First Amended

14   Complaint, was marked for purposes of

15   identification.)

16   BY MR. SEALEY:

17        Q.   Sir, I have just handed you what's

18   been marked as Plaintiff's Exhibit 4.  Have you

19   seen that document before?

20        **A.    Please give me a minute to review**

21   **it --**

22        Q.   Sure.

23        **A.    -- so I can --**

24        Q.   Take your time.

25        **A.    Okay.  Honestly, because I have**

1    **reviewed a lot of documents, I can't recall**

2    **whether I looked at this exact one.  I mean,**

3    **I --**

4            Q.   Fair enough.  Well, this was

5    provided to us by your attorneys.  You have now

6    had just a minute to review it, so I -- and you

7    don't recall if you have seen it before or not.

8    But what I would ask you to do is flip to -- it

9    says, I believe, page three of four.

10           And if you go to paragraph

11   eighteen, it says the foundation does not have

12   any record of sales from 1974 to 2006 to

13   Ceramics By Stu-Doodle located in Elizabeth

14   City, North Carolina.  You would agree with me,

15   sir, that based on your testimony today and the

16   documents that have subsequently been provided

17   that this information is no longer accurate?

18           **A.   It is not accurate due to my**

19   **disclosure of the additional documents I**

20   **discovered on August 29th --**

21           Q.   Right.

22           **A.   -- 2018.**

23           Q.   I am not calling Gary a liar.

24           **A.   Right.**

25           Q.   I am saying based on --

1          **A.    I just wanted to clarify that, I**
2    **believe it was accurate at that point in time.**
3          Q.    It was based on his belief, but we
4    now know this to be inaccurate?
5          **A.    Yes.**
6          Q.    All right.  And the very next
7    paragraph, he just -- we kind of change the
8    name.  It says the foundation does not have any
9    record of sales from 1974 to 2006 to Stu-Doodle
10   located in Elizabeth City, North Carolina.  The
11   allegations were that it was a company that
12   by -- went by one or both names.  But we know
13   at the very least his assertions that the
14   foundation did not have any records of sales to
15   Ceramics By Stu-Doodle or by Stu-Doodle in
16   Elizabeth City, North Carolina, is no longer
17   accurate; is that fair?
18         **A.    Please repeat the question.**
19         Q.    That was a horrible question.
20         **A.    It rambled a little bit.**
21         Q.    Yeah, it really was.  We know now
22   based on your findings in August of last year
23   that the statements made by Gary in paragraphs
24   18 and 19 of his affidavit are no longer
25   accurate; is that fair?

1          **A.    No, I don't think it is because**
2     **these time frames are different than the time**
3     **frames that we have new information about.  So**
4     **to say these were wholly inaccurate looking at**
5     **it as an engineer would not -- there is certain**
6     **parts of this time period where what he said is**
7     **still true.**
8          Q.   Okay.
9          **A.    Did I make that clear?**
10         Q.   I understand what you are saying,
11    but I think there is just a little disconnect
12    because it says you do not have any record of
13    sales during that, oh, thirty-two year time
14    period.  And, in fact, as we uncovered today
15    you do, in fact, have record of sales for some
16    period of time at least between 1974 and 2006,
17    fair?
18         **A.    We have new information that**
19    **contradicts that statement regarding three**
20    **years of that time frame that he refers to.**
21         Q.   Okay.  Okay, I --
22         **A.    Not the totality of --**
23         Q.   Fair enough.  There are records.
24    You are saying we don't have records somewhere
25    from 1974 and we don't have records somewhere

1    from 1990, but we certainly have records for

2    some of those years that reflect sales to

3    Ceramics By Stu-Doodle in Elizabeth City, North

4    Carolina, correct?

5         **A.    I wouldn't say we don't have**

6    **records.  We do have records, but they do not**

7    **contain reference to Stu-Doodle over much of**

8    **those years.**

9         Q.   Okay.  I would disagree with your

10   assertion that the documents only reflect sales

11   from 1970 to '80.  The documents obviously

12   speak for themselves.  We can go over that in a

13   minute.

14             Turning your attention to

15   paragraph twenty-two.  The foundation does not

16   have record of any reseller or distributor

17   located in North Carolina until 1991, well

18   after the foundation stopped packaging

19   pyrometric cones with vermiculite in 1983.

20             You would agree with me that based

21   on your findings in August of last year that

22   that statement in paragraph twenty-two is

23   inaccurate?

24             MS. DRAYTON:  Objection to the form.

25             THE WITNESS:  I think I can agree

1    that that one is inaccurate based on new

2    information that we found.

3                    MR. SEALEY:  Can we go off the record

4    for a minute?

5                    THE VIDEOGRAPHER:  Off the record,

6    11:03.

7                    (Thereupon, an off-the-record

8    discussion was had.)

9                    THE VIDEOGRAPHER:  We are back on the

10   record at 11:05.

11   BY MR. SEALEY:

12        Q.   Okay.  Sorry, Mr. Lawson, we just

13   went off the record there for a second.  But

14   you would agree with me that entries in these

15   cash receipts journals reflect sales to

16   Ceramics by Stu-Doodle in 1977 -- from 1977

17   through 1980, correct?

18        **A.   Okay.  My recollection -- I am**

19   **sorry, my recollection was '78 to '80.**

20        Q.   Fair enough.

21        **A.   But --**

22        Q.   And as we have established --

23        **A.   -- there are a lot of dates**

24   **involved in this, so --**

25        Q.   Fair enough.  You probably thought

1   I was going to quiz you on the corporate

2   history.  The -- and we can agree that to your

3   knowledge, these cash receipt journals are not

4   exhaustive of sales made by Orton during that

5   period of time?

6            MS. DRAYTON:  Objection to form,

7   objection as to time scope.

8            THE WITNESS:  I would be speculating

9   totally on that, so...

10  BY MR. SEALEY:

11       Q.   Okay.  You have no knowledge one

12  way or another?

13       **A.   No.**

14       Q.   Have you had an opportunity to

15  review a report prepared by MBA Scientific

16  Consultants in this case?

17       **A.   MBA Scientific Consultants?  I**

18  **don't recall anything like that.**

19       Q.   Are you aware that Karen Cahoon

20  located approximately eighteen boxes of Orton

21  cones that were still in her possession from

22  her mother in this case?

23       **A.   I don't know if it was eighteen.**

24  **I have been made aware that there are some**

25  **boxes.**

1          Q.   And you are aware that those boxes

2    were sent out for testing, and at least some of

3    those boxes were shown to have cones that were

4    packaged in vermiculite?

5               MS. DRAYTON:  Objection to form.

6               THE WITNESS:  I have been told that

7    some of the boxes -- I don't have firsthand

8    knowledge, but I have been told some of the boxes

9    have vermiculite packaging.

10   BY MR. SEALEY:

11         Q.   Okay.  What we know then based on

12   the information that's available and in front

13   of us is that Orton sold products to Ceramics

14   By Stu-Doodle in Elizabeth City, North

15   Carolina, at some period of time between 1974

16   and 1983; is that fair?

17              MS. DRAYTON:  Objection to the form,

18   objection to the scope, time period,

19   mischaracterizes testimony, evidence.

20              THE WITNESS:  To my knowledge and

21   memory, the time period was 1978 to 1980, and the

22   cash journals indicate that we received some

23   payment from Stu-Doodle.

24   BY MR. SEALEY:

25         Q.   And I am not talking only about

1   your cash receipt journals.  You -- Orton has

2   provided us evidence that from at least 1977

3   until 1980 that they sold products to Ceramics

4   By Stu-Doodle located in Elizabeth City, North

5   Carolina, correct?

6           MS. DRAYTON:  Objection to the form,

7   lack of foundation, object to the time period.

8           THE WITNESS:  Okay.  So I am not

9   trying to be argumentative, but I think you keep

10  saying 1977 to '78, 1978 -- and my recollection,

11  and as I said, there is a lot of dates, it was

12  1978 to 1980.

13  BY MR. SEALEY:

14      Q.   Okay.  I will represent to you

15  that the document Bates stamped Orton 0474

16  states receipts journal November 1977 and on

17  line eight reads Ceramics By Stu-Doodle.

18      **A.   All right.  Well, I am not looking**

19  **at that.  But if that's -- if that's what it**

20  **says, then I would say yes, your statement of**

21  **1977 to 1980 appears to be --**

22      Q.   And so we have got --

23      **A.   -- representative of what's in the**

24  **journals.**

25      Q.   Okay.  So we have got cash receipt

1   journals that represent sales from at least '77

2   to 1980 to Ceramics By Stu-Doodle in Elizabeth

3   City, North Carolina, correct?

4               MS. DRAYTON:  Objection to the form.

5               THE WITNESS:  I am sorry, will you

6   repeat the question?

7               MR. SEALEY:  Can you please read that

8   back, Monica?

9               (Question read.)

10              THE WITNESS:  I don't believe the

11  cash journals have the documentation of the city.

12  But in terms of the dates and receipt of monies, I

13  would agree with that.

14  BY MR. SEALEY:

15       Q.   Okay.  And you are not aware of

16  any other Ceramics By Stu-Doodle --

17       **A.   No, I am not.**

18       Q.   Okay.

19       **A.   I am just trying to be very**

20  **specific about what you are saying is in the**

21  **journal.**

22       Q.   Fair enough.  And you are not

23  aware of any other Ceramics By Stu-Doodle?

24       **A.   No.**

25       Q.   Okay.  And we also have an

1    affidavit prepared by Elaine Garrett that she

2    can recall Ceramics By Stu-Doodle purchasing

3    Orton pyrometric cones directly from Orton from

4    at least the time period of 1974 to 1984,

5    correct?

6         **A.    That's what her affidavit says.**

7         Q.   Okay.  And as you have already

8    indicated, you don't know one way or the other

9    whether these cash receipt journals are

10   exhaustive, correct?

11        MS. DRAYTON:  Objection, objection to

12   form, mischaracterizes and misstates testimony.

13   BY MR. SEALEY:

14        Q.   You don't know one way or the

15   other?

16        **A.    I would agree that I don't think**

17   **there is any way I could know.**

18        Q.   Fair enough.  There is no way

19   anyone could know?

20        MS. DRAYTON:  Objection to form,

21   lacks foundation.

22        THE WITNESS:  I am not aware of

23   anyone who does know.

24   BY MR. SEALEY:

25        Q.   Okay.  And I will represent to you

1    that in her deposition, Karen Cahoon testified

2    that she and her mother regularly went to

3    Ceramics By Stu-Doodle in Elizabeth City, North

4    Carolina, to purchase Orton pyrometric cones.

5    Based on that representation and based on the

6    information that we have available to us, you

7    would agree with me that for at least a period

8    of time from the 1970s until the early 1980s,

9    Orton repeatedly sold pyrometric cones packaged

10   in vermiculite to ceramic by Stu-Doodle?

11           MS. DRAYTON:  Objection to the form,

12   objection to time and scope, and

13   mischaracterization of facts not in evidence.

14           THE WITNESS:  I am sorry, will you

15   repeat the question?  I am trying to answer the

16   best I can.

17           MR. SEALEY:  Can you read it back?

18           (Question read.)

19           MS. DRAYTON:  The same objections,

20   form, mischaracterization, evidence, testimony.

21           THE WITNESS:  I think the only thing

22   that I can know is that we received payment from

23   Stu-Doodle from 1977 to 1980.  Beyond that, I

24   don't think I can credit or discredit anything.

25   BY MR. SEALEY:

```
 1          Q.    Okay.  So you --
 2          A.    That's all I know.  I mean --
 3          Q.    That's fair.  So you have no
 4    information contradictory to Elaine Garrett's
 5    assertion that what was being purchased was, in
 6    fact, Orton pyrometric cones?
 7               MS. DRAYTON:  Objection to form.
 8               THE WITNESS:  I don't feel that I --
 9    that I know.
10    BY MR. SEALEY:
11          Q.    And there is no one who would,
12    correct?
13          A.    I am not aware of anyone that
14    knows.
15          Q.    And likewise, you have no evidence
16    contradictory to Karen Cahoon's testimony that
17    she and her mother would go purchase Orton
18    pyrometric cones on a regular basis from
19    Ceramics By Stu-Doodle in Elizabeth City, North
20    Carolina, correct?
21          A.    I would totally be speculating.
22          Q.    You are not aware of anybody who
23    would have information contradictory to that,
24    correct?
25               MS. DRAYTON:  Objection to form.
```

1                    THE WITNESS:  I am not aware of

2     anyone that would know anything about what they

3     did.

4     BY MR. SEALEY:

5          Q.   In fact, the only information that

6     Orton has are these cash receipt journals which

7     appear to corroborate that at least there were

8     sales of something to Ceramics By Stu-Doodle in

9     Elizabeth City, North Carolina?

10                   MS. DRAYTON:  Objection as to form,

11    the scope, unlimited scope.

12                   THE WITNESS:  That's the only

13    documentation I am aware of that we have.

14    BY MR. SEALEY:

15         Q.   And that seems to corroborate the

16    other facts that are in evidence; is that fair?

17                   MS. DRAYTON:  Objection, the form,

18    foundation.

19                   THE WITNESS:  I would ask you to give

20    me a more specific question.  I don't even know

21    what you are asking me to agree to, honestly.

22    BY MR. SEALEY:

23         Q.   Okay.  The only documentation that

24    Orton has in its possession are these cash

25    receipt journals which appear to corroborate at

1   least in some part the testimony of Elaine

2   Garrett and the testimony of Karen Cahoon that

3   they purchased products supplied by Orton from

4   Ceramics By Stu-Doodle in Elizabeth City, North

5   Carolina?

6           MS. DRAYTON:  Objection as to form,

7   objection as to scope and time.

8           THE WITNESS:  All right.  I am sorry,

9   would you please repeat the question?  Because

10  these questions change slightly, and I want to

11  make sure I understand.

12          (Question read.)

13          MS. DRAYTON:  The same objection.

14          THE WITNESS:  I don't know that I can

15  say anything beyond the fact that the journals

16  indicate that we received money from Stu-Doodle

17  from 1977 now, you have corrected me, I am

18  accepting that based on what you said, to 1980.

19  And I think me going beyond that, I have no idea

20  what actually happened.

21  BY MR. SEALEY:

22      Q.   And there isn't anyone who

23  would --

24      **A.   I am not aware of anybody that**

25  **would know that, other than this that you have**

1  **put in front of me.**

2      Q.  You are not aware of anybody from

3  Orton who would have any information

4  contradictory to that?

5      **A.  No.**

6          MR. SEALEY:  Mr. Lawson, that's all

7  the questions I have for you.  Thank you for your

8  time, sir.

9          MS. DRAYTON:  I am going to ask you

10  just a couple, Mr. Lawson, just to clarify.

11          THE WITNESS:  Okay.

12              DIRECT EXAMINATION

13  BY MS. DRAYTON:

14      Q.  The ledgers and journals that we

15  have been talking about I believe in Exhibit 2

16  reflect specific dates of, for example, each

17  month of years consecutively through, I

18  believe, from 1974 until 1985 maybe; is that

19  correct?

20      **A.  I believe that's correct.**

21      Q.  Okay.  And they actually list the

22  date, the month, and the year in terms of each

23  sale that was made on, for example,

24  January 5th, 1975?

25      **A.  I believe that's correct.**

1          Q.   And I said each sale, but the
2    receipt of monies for each particular day; is
3    that correct?
4          **A.   Right.**
5          Q.   Okay.  And you don't have any
6    information or reason to believe that the
7    foundation would have received funds from any
8    person or any company that was not reflected in
9    those ledgers for those days and years; is that
10   accurate?
11               MR. SEALEY:  Objection to form,
12   foundation.
13               THE WITNESS:  We have no
14   documentation or indication that there were
15   additional monies received.
16   BY MS. DRAYTON:
17         Q.   Outside of what was reflected on
18   each day of each month of each year from 1974
19   until 1985; is that accurate?
20         **A.   Yes, I believe that's accurate.**
21         Q.   I just wanted to clarify another
22   date.  We have been talking about a lot of
23   different dates.
24         **A.   All right, thank you.  I am open**
25   **to that.**

1          Q.   Sure.  And there were

2    references -- I believe you referenced a

3    distributor in North Carolina beginning in

4    1999.  Is it possible that there was a

5    distributor in 1991 in North Carolina?

6          **A.   Okay.  Yes, that's highly possible**

7    **that I did not remember that date accurately.**

8          Q.   Specific date?

9          **A.   I am sure it was in the '90s.  It**

10   **may have been 1991 instead of 1999.**

11              MS. DRAYTON:  Thank you, sir.  That's

12   all I have.

13              THE WITNESS:  All right.  Thank you

14   for clarifying that.

15                    RECROSS-EXAMINATION

16   BY MR. SEALEY:

17        Q.   Just one quick follow-up on Amy's

18   question there for you.  As you pointed out,

19   Orton has no documentation of any additional

20   monies received by any customers not reflected

21   in these cash receipt journals, correct?

22        **A.   That is correct.**

23        Q.   But that's not to say that there

24   couldn't be -- there couldn't have been more

25   transactions, you just haven't found any

1  documentation that would speak to those; is

2  that fair?

3           MS. DRAYTON:  Objection as to form,

4  foundation, scope.

5           THE WITNESS:  Okay.  So it feels -- I

6  think you are asking me to -- can you please

7  repeat that question?  Because we are talking

8  about whether documents that don't exist may or

9  may not exist.  I need some clarification.

10 BY MR. SEALEY:

11      Q.   Well, I think what we are trying

12 to establish here is just because there is not

13 information in these documents that Ceramics By

14 Stu-Doodle didn't send you money in let's say

15 1974, that doesn't mean it didn't happen,

16 correct, it's just not reflected in these cash

17 receipt journals?

18           MS. DRAYTON:  Objection to form.

19           THE WITNESS:  I think you are asking

20 me to speculate on a hypothetical, and I really

21 feel like I would be speculating.

22 BY MR. SEALEY:

23      Q.   Well, because you just don't know,

24 correct?

25           MS. DRAYTON:  Objection to the form.

1    BY MR. SEALEY:

2        Q.   You have no firsthand knowledge,

3    as we have established?

4        **A.   I want to answer questions.  So**

5    **please repeat a question to me, and I will try**

6    **to answer it.**

7        Q.   The cash receipt journals that you

8    provided to us today, there are no entries for

9    Ceramics By Stu-Doodle for, say, 1974?

10       **A.   Not to my knowledge.**

11       Q.   Okay.

12       **A.   And it has not been disclosed by**

13   **anyone that there is.**

14       Q.   It has not been disclosed by Orton

15   that there was, correct?

16       **A.   Well, it hasn't been disclosed by**

17   **you, either, in this discussion.**

18       Q.   Well, have you read the affidavit

19   of Elaine Garrett that says that they were

20   purchasing Orton cones from at least 1974 to

21   1984?

22       **A.   That's what this piece of paper**

23   **right in front of me says.**

24       Q.   And my question to you, sir, is

25   you have no evidence that's contradictory to

1   that; is that fair?

2           MS. DRAYTON:  Objection to form,

3   mischaracterizes testimony.

4           THE WITNESS:  I don't believe we have

5   any evidence that relates to it beyond the years

6   1977 to 1980.

7   BY MR. SEALEY:

8       Q.   Right.  The only evidence that you

9   have, in fact, corroborates sales to Ceramics

10  By Stu-Doodle from 1970 to 1980, correct?

11          MS. DRAYTON:  Objection to the form.

12          THE WITNESS:  '70 to '80?  No.

13  BY MR. SEALEY:

14      Q.   '77 to 1980.

15      **A.   '77 to 1980, I think we are in**

16  **agreement on that, thank you.**

17      Q.   And my question is just because

18  these cash receipt journals don't reflect a

19  sale in, say, 1974 to Ceramics By Stu-Doodle,

20  as you have already indicated, that doesn't

21  mean it doesn't happen -- it didn't happen, we

22  just don't know?

23          MS. DRAYTON:  Objection to form,

24  mis --

25          THE WITNESS:  I don't believe I have

1  indicated that.

2           MS. DRAYTON:  Mischaracterizes

3  testimony.

4           THE WITNESS:  I don't recall

5  indicating that.

6  BY MR. SEALEY:

7       Q.   These cash receipt journals marked

8  as Exhibit 2, you don't know if they are

9  exhaustive, correct?

10          MS. DRAYTON:  Objection to form.

11          THE WITNESS:  As I think we have

12  discussed before, I don't think there is any way I

13  could know anything conclusively that happened in

14  a time and a place where I wasn't there.

15  BY MR. SEALEY:

16       Q.   That's fair.  And so my question

17  to you, sir, is just because these cash receipt

18  journals may not reflect a transaction that

19  took place in 1974, that doesn't mean it didn't

20  happen?

21          MS. DRAYTON:  Objection to the form,

22  mischaracterizes.

23          THE WITNESS:  Once again, I feel like

24  the question is trying to get me to endorse a

25  hypothetical.

1    BY MR. SEALEY:

2         Q.   That's exactly what we are doing,

3    sir.

4         **A.   And I am not used to this kind of**

5    **language as a nonlawyer, so I am a little bit**

6    **torn about how to be most straightforward in**

7    **answering your question.**

8         Q.   Well, you could just answer the

9    hypothetical.

10        **A.   I mean, anything could have**

11   **happened and not be in that document, but that**

12   **doesn't lead me to any conclusion.  But as I**

13   **understand the language as a layman, I will say**

14   **things could happen that are not in that**

15   **notebook.**

16        Q.   Okay.  Including sales to Ceramics

17   By Stu-Doodle in Elizabeth City, North

18   Carolina?

19        **A.   I think that would be speculation**

20   **on my part to -- to start to talk about the**

21   **probability of a -- of something that I have no**

22   **knowledge of.**

23             MR. SEALEY:  Okay, fair enough.

24   That's all the questions I have.

25             MS. DRAYTON:  I think that's it.

1                    THE VIDEOGRAPHER:  The time is 11:26.

2      The deposition is concluded.  Stand by.

3                    (Thereupon, the deposition was

4      concluded at 11:26 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  STATE OF OHIO          )

2  COUNTY OF MONTGOMERY )  SS: CERTIFICATE

3              I, Monica K. McBee, a Notary

4  Public within and for the State of Ohio, duly

5  commissioned and qualified,

6              DO HEREBY CERTIFY that the

7  above-named MARK G. LAWSON, was by me first duly

8  sworn to testify the truth, the whole truth and

9  nothing but the truth.

10             Said testimony was reduced to

11 writing by me stenographically in the presence

12 of the witness and thereafter reduced to

13 typewriting.

14             I FURTHER CERTIFY that I am not a

15 relative or Attorney of either party, in any

16 manner interested in the event of this action,

17 nor am I, or the court reporting firm with which

18 I am affiliated, under a contract as defined in

19 Civil Rule 28(D).

20

21

22

23

24

25

1          IN WITNESS WHEREOF, I have hereunto set

2    my hand and seal of office at Dayton, Ohio, on

3    this 28th day of February, 2019.

4

5

6

7

8                              _____
                               MONICA K. MCBEE
9                              NOTARY PUBLIC, STATE OF OHIO
                               My commission expires 4-18-2020

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A**

a.m 1:19 5:3 73:4
able 22:5
above-named
74:7
abrasion 11:10
absolutely 7:13
accepted 28:15
accepting 64:18
account 22:6
accountant 40:7
accounting 28:12
36:16
accurate 22:6
29:24 33:16
51:17,18 52:2
52:17,25 66:10
66:19,20
accurately 21:13
67:7
acquired 21:21
action 74:16
additional 35:4
45:9 51:19
66:15 67:19
administration
10:10 17:1
adrayton@dea...
4:13
advanced 38:20
advertise 46:22
advertised 47:1
advertisement
47:1
affidavit 2:17 3:3
42:9,19 43:12
46:11,13,17
50:11 52:24
60:1,6 69:18
affiliated 74:18
age 5:7
ago 17:11
agree 20:24 43:21
44:17 51:14
54:20,25 55:14
56:2 59:13
60:16 61:7
63:21
agreed 5:13 20:6
20:11
agreement 70:16
air 14:22 45:19
allegations 52:11
alluded 28:5
Alton 4:6
aluminate 12:13
Amended 2:9 3:7

19:14 50:13
amount 28:23
38:14
amounts 7:5 46:4
Amy 4:10 19:12
Amy's 67:17
and/or 32:16
answer 8:5 21:13
46:24 61:15
69:4,6 72:8
answered 33:22
answering 72:7
answers 7:18
anybody 25:24
26:15 62:22
64:24 65:2
apologize 15:16
27:22
appear 33:16
41:18 63:7,25
APPEARANCES
4:1
appears 38:13
58:21
approximate 8:3
approximately
5:3 12:23 17:19
31:10 38:4 43:7
56:20
area 30:20,22
31:8 48:20
argumentative
58:9
asbestos 7:6
asked 8:6 12:2
asking 27:19
63:21 68:6,19
assertion 41:21
54:10 62:5
assertions 43:11
52:13
assume 8:5,22
20:23
assuming 36:7,18
assumption 36:21
39:6
attempt 24:20
attention 24:23
54:14
attorney 4:5,10
5:24 74:15
attorneys 51:5
August 34:25
51:20 52:22
54:21
automated 38:24
automotive 14:17
14:19

**B**

available 22:8
24:21 44:13
57:12 61:6
aware 11:6,7 31:6
33:23 34:2 37:8
40:15,20,25
41:6,10 46:5
47:19 56:19,24
57:1 59:15,23
60:22 62:13,22
63:1,13 64:24
65:2

bachelor's 12:22
back 15:3,8 16:19
18:7,14 30:15
37:14 42:2
47:23 55:9 59:8
61:17
background 9:5
9:18
balance 12:20
Bartlett 14:10
based 20:24 21:2
21:17 30:1
33:15 37:11
38:2 41:2 44:11
51:15,25 52:3
52:22 54:20
55:1 57:11 61:5
61:5 64:18
basically 23:2
basis 43:2 62:18
Bates 58:15
beat 23:9
beginning 67:3
behalf 4:2,8 5:11
8:13
belief 37:12 39:1
52:3
believe 12:16,25
20:12 26:5
35:24 37:13,14
39:17 46:10
49:8,20,23 51:9
52:2 59:10
65:15,18,20,25
66:6,20 67:2
70:4,25
benefit 6:1 7:19
9:16
best 8:3 24:13
32:10 35:25
37:3,6 47:5,24
47:25 61:16
better 34:22 39:25

**C**

beyond 5:17
18:18 61:23
64:15,19 70:5
big 31:10
binder 2:13 32:24
bit 7:9 10:17 28:6
34:1 44:25
52:20 72:5
box 24:1
boxes 56:20,25
57:1,3,7,8
break 8:9 33:5
bring 19:6
broad 49:6,11
broadly 45:22
brought 32:20
build 19:1
bulk 30:5,12
burden 32:16
business 9:20
10:9 16:25
17:21 18:19,21
25:10 36:2 37:5
38:18 45:13,18
48:7,7,12,25
businesses 16:25
17:2,23,24 45:4
buy 49:3

**C**

C 4:10
C-A-S-T-O-L-I-N
11:3
cabinets 31:20,24
cage 23:18,25
24:2 28:5 29:9
29:22 30:16
34:5,12,17
35:11
Cahoon 1:4 5:11
5:25 27:20
40:22 41:3,22
56:19 61:1 64:2
Cahoon's 27:15
62:16
called 1:14 10:22
15:9
calling 51:23
CARBIDE 1:9
carbonate 12:12
Carolina 1:2 4:12
40:24 41:5,14
41:24 42:22
43:25 44:21
46:6 49:21
51:14 52:10,16
54:4,17 57:15

58:5 59:3 61:4
62:20 63:9 64:5
67:3,5 72:18
case 1:7 6:1 7:3
27:1,3 28:1
32:12 33:10
36:9 40:21,22
41:14 42:20
48:10 56:16,22
cash 33:20 34:9
34:15 35:4,13
35:20 36:12
38:6,10,16 39:2
39:9,20 40:12
40:16 41:16
43:14,22 44:4,7
44:18 55:15
56:3 57:22 58:1
58:25 59:11
60:9 63:6,24
67:21 68:16
69:7 70:18 71:7
71:17
Castolin 10:22
11:3,4 12:3
cautioned 5:8
cell 12:12
centered 18:5
ceramic 3:5 6:11
17:8,12 50:12
61:10
ceramics 1:8 14:4
40:18,22 41:4,4
41:6,7,12,23
42:21,24 43:6
43:24 44:19,20
46:5 49:7,10,13
49:17 51:13
52:15 54:3
55:16 57:13
58:3,17 59:2,16
59:23 60:2 61:3
62:19 63:8 64:4
68:13 69:9 70:9
70:19 72:16
certain 20:7 28:22
35:14 47:15
53:5
certainly 8:4
39:18 49:14
54:1
CERTIFICATE
74:2
certified 5:9
CERTIFY 74:6,14
cetera 21:23
chain 15:19

**chance** 9:12
33:14 40:11
**change** 15:4 52:7
64:10
**Charlotte** 4:12
**check** 20:16
**Chicago** 10:10
12:1,6 14:10
**Childress** 3:4 9:9
22:25 24:5
48:13 50:11
**choice** 19:3
**city** 40:23 41:5,14
41:24 42:21
43:25 44:20
46:6 51:14
52:10,16 54:3
57:14 58:4 59:3
59:11 61:3
62:19 63:9 64:4
72:17
**Civil** 1:16 74:19
**clarification** 68:9
**clarify** 52:1 65:10
66:21
**clarifying** 67:14
**classify** 48:6
49:10
**clear** 44:13 53:9
**Columbus** 1:18
16:19 48:19,20
**come** 8:24 32:19
49:3,16
**commission** 75:9
**commissioned**
74:5
**companies** 18:4
18:17 50:1
**company** 1:9
10:22 15:17,20
15:25 16:1
17:18 23:6,9
25:9,22 28:20
29:17 49:2,5
52:11 66:8
**compare** 8:1
**compensated**
8:25
**Complaint** 3:7
50:14
**comply** 28:16
**components**
14:22,23
**computers** 38:22
**conclude** 44:8
**concluded** 73:2,4
**conclusion** 37:1
72:12

**conclusively**
71:13
**conduct** 45:1
**conducted** 2:1
36:3
**cone** 29:16 45:13
**cones** 17:22
18:23 39:4
40:17 41:8,12
41:23 42:25
43:15,24 44:6
46:18 48:18
54:19 56:21
57:3 60:3 61:4,9
62:6,18 69:20
**confused** 13:9
**conjunction**
12:18
**Conroy** 4:3
**consecutively**
65:17
**consultant** 16:24
**Consultants**
56:16,17
**consulting** 17:3
**contact** 9:8
**contain** 54:7
**contained** 38:10
39:9,20
**continue** 18:21
**continuous** 43:2
**contract** 74:18
**contradict** 41:21
43:11
**contradicting**
43:17
**contradictory**
62:4,16,23 65:4
69:25
**contradicts** 53:19
**cooling** 45:20
**copies** 33:17 34:6
34:10
**copy** 32:16,21
**copying** 32:17
**corporate** 56:1
**corporation** 1:9
8:18
**correct** 6:6,9 8:14
8:20 9:2 10:16
11:17,20 13:6
16:1 17:22
21:18,19,24
38:8 39:4,21
43:25 46:18
48:2 49:18,22
50:5,6 54:4
55:17 58:5 59:3

60:5,10 62:12
62:20,24 65:19
65:20,25 66:3
67:21,22 68:16
68:24 69:15
70:10 71:9
**corrected** 64:17
**correctly** 43:3,8
43:14
**corroborate**
30:11 63:7,15
63:25
**corroborates**
43:22 70:9
**counsel** 5:11,13
20:5 33:18
**count** 32:5
**countries** 18:20
**COUNTY** 74:2
**couple** 29:12
65:10
**course** 32:21 37:5
38:17
**court** 1:1 4:5 5:4
7:18 74:17
**cover** 5:17 45:4
**covered** 27:9
**covers** 23:7
**credit** 61:24
**cross-examinat...**
1:15 5:20
**cup** 15:25 16:1
**currently** 6:8
**customers** 19:2
49:3,16 67:20
**cutoff** 38:23
**CV** 9:12

_____
**D**
**date** 18:15 34:20
38:13 65:22
66:22 67:7,8
**dated** 36:5
**dates** 55:23 58:11
59:12 65:16
66:23
**dating** 47:23
**day** 16:21 20:3
32:5 35:2 66:2
66:18 75:3
**days** 66:9
**Dayton** 75:2
**Dean** 4:9
**death** 23:9
**DECEASED** 1:5
**December** 24:14
**decision** 16:22

**Defendant** 3:4
50:12
**Defendants** 1:10
4:8
**defended** 13:14
**defer** 25:25
**defined** 74:18
**definition** 31:2
**degrade** 11:10
**degree** 9:20,22
10:8,14,19
**degrees** 9:19
**delineated** 20:7
20:23
**dep** 27:10
**department** 36:16
**depends** 28:19
**deposed** 6:20
**deposition** 1:13
2:10 5:14,23
7:10 19:15 20:1
20:6,8 22:1,4
24:17 27:3,11
27:13,25 28:2
61:1 73:2,3
**depositions** 24:18
24:21 48:12
**described** 35:2
**description** 45:3
**device** 15:17
**died** 30:9
**different** 18:3,4,6
18:7,20 53:2
66:23
**dimensions** 7:24
**direct** 21:2,17
65:12
**directionally**
47:13
**directly** 43:1 60:3
**director** 14:14
15:6
**disagree** 54:9
**disclosed** 23:17
33:20 34:18
41:17 69:12,14
69:16
**disclosure** 51:19
**disconnect** 53:11
**discovered** 34:5
51:20
**discovery** 1:13
2:10 19:15
**discredit** 61:24
**discussed** 48:14
71:12
**discussion** 55:8
69:17

**Dismiss** 3:6 50:13
**distribution** 48:8
48:24
**distributor** 38:14
50:3 54:16 67:3
67:5
**distributors** 39:3
41:7 48:4 49:9
49:20 50:1
**DISTRICT** 1:1,2
**division** 14:17
18:12,22,24,25
**document** 2:8,17
3:2 19:14,23
20:2 23:18 24:2
27:7 28:7,19,20
31:5 42:9,14,15
42:17 43:14
46:21 50:10,19
58:15 72:11
**documentation**
22:13 59:11
63:13,23 66:14
67:19 68:1
**documents** 2:13
21:22 22:24
23:14,15,23
27:2,6,24 28:18
28:22,24 29:9
29:10,12,20,21
29:25 30:9,14
31:9 32:2,11,12
32:17,24 33:9
33:11,19,24
34:2,5,7,21 35:3
36:1 37:8,11,13
37:17,24 50:2
51:1,16,19
54:10,11 68:8
68:13
**doing** 12:17 15:18
18:14 19:3 72:2
**dollar** 46:3
**draw** 45:19
**drawers** 31:20
**Drayton** 2:3 4:10
20:13 23:11
27:12,17,19
36:24 39:11
42:5 44:1 46:23
47:6,17 54:24
56:6 57:5,17
58:6 59:4 60:11
60:20 61:11,19
62:7,25 63:10
63:17 64:6,13
65:9,13 66:16
67:11 68:3,18

68:25 70:2,11
70:23 71:2,10
71:21 72:25
**Drew** 4:4 5:11,24
27:13
**Drive** 1:18
**dsealey@simm...**
4:7
**due** 11:10 51:18
**duly** 5:8 74:4,7

**E**

**E-L-K-A-Y** 13:22
**E-U-T-E-C-T-I-C**
11:1
**earlier** 34:18
44:25
**earliest** 50:3
**early** 18:14 61:8
**EASTERN** 1:2
**education** 12:21
**educational** 9:18
**Edward** 1:8 3:5
6:11 17:8,12,15
18:12 30:6,9
50:12
**eight** 32:10 33:14
58:17
**eighteen** 51:11
56:20,23
**either** 69:17 74:15
**Elaine** 43:12
46:12,17 60:1
62:4 64:1 69:19
**electronic** 32:15
**eleven-page** 2:8
19:14
**Elizabeth** 40:23
41:5,14,24
42:21 43:25
44:20 46:6
51:13 52:10,16
54:3 57:14 58:4
59:2 61:3 62:19
63:9 64:4 72:17
**Elkay** 13:20,23
14:6 15:3
**employed** 6:8,10
43:6
**employee** 25:14
42:20
**employees** 21:22
23:2 24:25 25:1
25:3,4,21
**employment** 43:2
**empty** 31:23,24
**endorse** 71:24

**engineer** 12:7
13:25 25:20
26:11 53:5
**engineering** 9:19
9:22 10:3,14,15
10:19 14:14
15:6 16:13
**enlisted** 50:3
**entire** 45:4
**entries** 40:12,16
55:14 69:8
**equipment** 45:1
**especially** 18:9
33:7
**establish** 68:12
**established** 55:22
69:3
**ESTATE** 1:4
**estimate** 8:3 31:9
31:15
**et** 21:23
**Eutectic** 10:22,25
11:4 12:3
**evasive** 21:10
**event** 74:16
**events** 22:7
**everybody** 25:23
**evidence** 43:21
57:19 58:2
61:13,20 62:15
63:16 69:25
70:5,8
**exact** 18:15 51:2
**exactly** 34:8 72:2
**EXAMINATION**
65:12
**EXAMINATIONS**
2:1
**examined** 5:9
**examining** 21:5
**example** 65:16,23
**excess** 29:2
**exchangers** 14:23
**excluding** 47:20
**EXECUTRIX** 1:4
**exhaust** 14:21
**exhaustive** 39:10
56:4 60:10 71:9
**Exhibit** 2:7,12,16
3:1 19:12,13
32:13,23 42:8
50:9,18 65:15
71:8
**EXHIBITS** 2:6
**exist** 68:8,9
**existed** 35:14
**exists** 7:5 35:20

**expectation** 49:1
49:15
**expires** 75:9
**exploring** 7:4
**exposure** 7:5
**extensively** 24:6
**extent** 7:25 22:6

**F**

**facility** 31:5,7
**fact** 20:24 46:16
49:19 53:14,15
62:6 63:5 64:15
70:9
**facts** 61:13 63:16
**fair** 6:16 8:10 21:6
21:25 24:4
25:24 26:17,22
29:8,23 30:7,14
32:4 36:20
43:20 48:5,21
48:21 49:4 51:4
52:17,25 53:17
53:23 55:20,25
57:16 59:22
60:18 62:3
63:16 68:2 70:1
71:16 72:23
**fairly** 26:1
**familiar** 14:12
**February** 1:19 5:2
75:3
**feel** 15:7 62:8
68:21 71:23
**feels** 68:5
**feet** 31:17,17
**fifty-five** 32:11
33:15
**figure** 32:9
**filing** 31:20,24
**find** 22:24 34:21
**findings** 52:22
54:21
**fine** 6:17,18 8:11
13:3
**fired** 46:1
**firing** 45:14
**firm** 74:17
**first** 3:7 5:7 9:5
20:1 24:10,12
33:10 34:7
37:19 50:13
74:7
**firsthand** 24:3
57:7 69:2
**Flexonics** 14:8,13
14:16

**flip** 51:8
**Florida** 16:15,16
16:18 17:5
**Flushing** 12:4
**follow** 34:11
46:11
**follow-up** 67:17
**following** 43:13
**follows** 5:9
**form** 38:20 39:11
42:5 44:1 46:23
47:6 54:24 56:6
57:5,17 58:6
59:4 60:12,20
61:11,20 62:7
62:25 63:10,17
64:6 66:11 68:3
68:18,25 70:2
70:11,23 71:10
71:21
**former** 24:25 25:1
25:3 42:20
**found** 35:4,6,18
37:9 55:2 67:25
**foundation** 1:8
6:12 8:19 9:2
17:9,12 26:10
42:6 51:11 52:8
52:14 54:15,18
58:7 60:21
63:18 66:7,12
68:4
**Foundation's** 3:6
50:12
**four** 12:16 13:6
15:8 16:7 26:9
42:24 46:19
51:9
**four-page** 3:2
50:10
**fourteen** 17:11,18
20:25 22:3
**fourth** 20:13
**frame** 53:20
**frames** 53:2,3
**Friday** 1:19
**front** 37:18,21
38:3 41:18
57:12 65:1
69:23
**fuel** 12:12
**full** 6:2
**full-time** 11:16
**fun** 6:23
**funds** 66:7
**furniture** 45:23
46:8,14

**FURTHER** 74:14

**G**

**G** 1:14 5:6 74:7
**Gabriel** 4:15
**Garden** 1:18
**Garrett** 43:12 60:1
64:2 69:19
**Garrett's** 46:12,17
62:4
**Gary** 3:3 9:9 22:25
24:5,12 48:13
50:11 51:23
52:23
**Gary's** 24:17
**Gas** 11:24 12:6,15
13:5
**gather** 25:2
**general** 8:23 9:1,6
9:9 17:14 23:1,6
36:16 38:15
48:13
**generally** 28:15
38:12
**geographic** 47:15
47:20
**getting** 11:19
12:18 33:8
**Gibson** 4:9
**give** 7:17,24 8:5
19:3 22:5 50:20
63:19
**given** 27:8
**glass** 33:5
**gloves** 45:18 46:7
46:14
**go** 7:9 10:20
11:15 12:24
14:5 15:12
16:23 23:15
26:19 37:13,24
42:23 51:10
54:12 55:3
62:17
**goes** 38:5
**goggles** 45:19
46:14
**going** 7:14 8:7
10:23 19:10,18
23:10 32:19,20
33:2,4 42:12
56:1 64:19 65:9
**good** 16:22 21:14
23:11 44:23
**goods** 44:19,22
**GRACE** 1:4
**graduate** 11:15

**graduated** 10:19
11:21 13:13
**great** 16:3
**greater** 48:19
**Grisham** 24:22
**Griswold** 6:3
**ground** 7:10
**guarantee** 29:5
**guess** 17:11 23:8
31:2 33:10
**guys** 24:6

**H**

**hand** 5:4 19:18
32:20 33:2
42:12 75:2
**handed** 50:17
**handling** 22:14
**hands** 22:18
26:24
**handwritten** 30:8
36:4
**Hanly** 4:3
**happen** 68:15
70:21,21 71:20
72:14
**happened** 21:4,16
22:9 34:23
64:20 71:13
72:11
**happy** 7:15
**head** 7:20
**headache** 23:14
**headquarters**
30:24 31:3
**heat** 14:23
**help** 10:23
**hereinafter** 5:8
**hereunto** 75:1
**high** 18:5,10
**highlight** 20:10
**highly** 67:6
**Hilton** 1:18
**historical** 29:10
29:12,20 30:3
**history** 9:15 10:18
22:12 23:5,9
56:2
**hold** 28:24 29:6
**honestly** 50:25
63:21
**horrible** 52:19
**huh** 15:8
**hundred** 32:10
33:14 48:22
**hypothetical**
68:20 71:25

72:9

**I**

**idea** 32:1 64:19
**identification**
2:11,15,19 3:9
19:16 32:25
42:10 50:15
**identified** 41:13
**identify** 24:25
**Illinois** 4:6 12:1
14:11
**inaccurate** 52:4
53:4 54:23 55:1
**incidents** 48:17
**include** 45:18
**Including** 72:16
**indicate** 43:15
44:4 57:22
64:16
**indicated** 24:4
60:8 70:20 71:1
**indicating** 71:5
**indication** 66:14
**industrial** 49:9
**industries** 18:8
**industry** 47:2
**infamous** 28:5
**information** 7:4
22:8 28:12
38:10 39:7,9
41:20 43:10
44:12 51:17
53:3,18 55:2
57:12 61:6 62:4
62:23 63:5 65:3
66:6 68:13
**Inn** 1:18
**Institute** 9:23
11:24 12:6,15
13:5
**instruments** 19:1
19:2 45:3
**INSURANCE** 1:9
**interested** 74:16
**interject** 27:12
**international**
15:21 18:21
**interpretation**
43:18 44:12
**interpreted** 43:17
**interviewed** 24:5
**interviewing**
22:25
**involved** 55:24
**IRS** 28:16
**ISO** 28:20

**issues** 5:15,18
**item** 48:23
**items** 20:7,22

**J**

**Jackson** 4:15
**January** 17:10
65:24
**Jim** 25:7,8 26:16
**job** 13:1
**journal** 44:7 58:16
59:21
**journals** 33:21
34:10,15 35:5
35:13,20 36:12
38:11,17 39:2
39:10,20 40:8
40:13,16 41:16
41:17 43:15,22
44:4,18 55:15
56:3 57:22 58:1
58:24 59:1,11
60:9 63:6,25
64:15 65:14
67:21 68:17
69:7 70:18 71:7
71:18
**Jr** 1:8 3:5 6:11
17:12 50:12
**jurisdictional**
5:15,17

**K**

**K** 1:16 74:3 75:8
**Karen** 1:4 5:11,25
27:15,15 40:22
41:3,21 56:19
61:1 62:16 64:2
**keep** 28:22 34:22
58:9
**keeping** 36:12
40:8
**keeps** 24:23 28:8
**kept** 37:4 38:17
**kiln** 45:19,20,23
46:1,7,7,14,14
**kind** 9:14,17
26:23 34:20
49:6 52:7 72:4
**kinds** 28:22
**knew** 35:13
**know** 6:13,15
7:23 8:9 18:15
24:3 25:11
26:12,16 30:2
33:13 34:20
35:16 36:7,11

36:14,17 38:23
39:7,8,18 40:2,6
41:15,18 43:19
47:12 49:25
52:4,12,21
56:23 57:11
60:8,14,17,19
60:23 61:22
62:2,9 63:2,20
64:14,25 68:23
70:22 71:8,13
**knowing** 39:13
**knowledge** 18:13
21:3,17,20 22:7
25:2 34:4 36:1
36:22 37:3,6
38:2 40:4,5 47:5
47:24,25 56:3
56:11 57:8,20
69:2,10 72:22
**knowledgeable**
20:20 26:2
**knows** 62:14

**L**

**L-A-W-S-O-N** 6:5
**lack** 58:7
**lacks** 42:6 60:21
**language** 72:5,13
**lapse** 35:24
**Law** 4:5,10
**lawful** 5:7
**Lawson** 1:14 5:6
5:16,22 6:4,7,19
42:13 55:12
65:6,10 74:7
**lawyer** 43:19
**layman** 72:13
**lead** 72:12
**leader** 15:19
**learn** 22:4,12 23:5
**learning** 9:17
**ledgers** 38:7
65:14 66:9
**left** 14:6 16:4,5
**let's** 9:10 32:8
40:8 68:14
**liar** 51:23
**LIFE** 1:8
**lifetime** 30:6
**likes** 23:21
**likewise** 62:15
**limit** 5:13 20:6
47:14
**limited** 18:13,18
46:24 47:18
**line** 45:5,8 58:17

**list** 65:21
**lists** 49:19
**lithium** 12:13
**litigation** 33:25
**little** 7:9 10:17
28:6 34:1 44:25
52:20 53:11
72:5
**Litzinger** 25:7,8
**living** 16:16,17,18
**local** 48:17
**located** 12:3 14:9
40:23 51:13
52:10 54:17
56:20 58:4
**location** 30:25
31:1 48:19
**lock** 32:4
**Locked** 23:25
**logic** 43:13 46:11
**long** 8:8 12:14
16:6 18:11
25:11 26:12
28:22 49:25
**long-term** 23:2
25:4
**longer** 51:17
52:16,24
**longest** 25:7,13
**look** 19:22
**looked** 22:18
34:13 35:3 51:2
**looking** 53:4
58:18
**lot** 12:10 22:2,24
31:22,23 32:22
43:18 51:1
55:23 58:11
66:22
**love** 16:2
**Lyra** 1:18

**M**

**M-C-I-N-N-E-R-Y**
26:5
**manager** 8:23 9:1
9:6,9 17:14 23:1
25:10 36:17
48:13
**manner** 74:16
**manufacture**
18:23
**manufacturing**
13:20,24 17:4
17:21
**mark** 1:13 5:6 6:3
19:12 20:14

32:13 74:7
**marked** 2:6,10,14
  2:18 3:8 19:15
  32:24 42:9
  50:14,18 71:7
**master's** 10:2,9
  10:14 11:19,22
  13:7
**materials** 7:7 12:7
  12:8,9,10,11
  13:25 14:1 18:1
  18:4,6,9,24
  22:20 26:20
  28:18 44:25
  45:1,2
**math** 25:19
**matrix** 28:21
**max** 29:4,5
**MBA** 10:15 12:18
  56:15,17
**McBee** 1:16 74:3
  75:8
**McDowell** 4:11
**McInnerny** 26:1
**mean** 29:11 51:2
  62:2 68:15
  70:21 71:19
  72:10
**means** 18:2
**measure** 18:6
**medical** 15:17
**meet** 24:12
**memory** 24:13
  35:23 57:21
**mentioned** 35:9
**mentor** 24:11
**met** 5:22
**metal** 31:22,24
**metals** 14:3
**METROPOLITAN**
  1:8
**mezzanine** 23:18
  30:16,18,19
**mind** 19:21 20:4,9
  33:3 42:13
**mine** 24:11
**minimum** 28:23
**minute** 50:20 51:6
  54:13 55:4
**mis** 70:24
**mischaracteriz...**
  61:13,20
**mischaracterizes**
  57:19 60:12
  70:3 71:2,22
**misstates** 60:12
**model** 48:6,7,12
  48:25

**molten** 12:12
**money** 38:15 44:5
  64:16 68:14
**Monica** 1:16
  32:15 59:8 74:3
  75:8
**monies** 59:12
  66:2,15 67:20
**MONTGOMERY**
  74:2
**month** 37:19
  65:17,22 66:18
**months** 17:11,18
  21:1 22:3
**mother** 41:22
  56:22 61:2
  62:17
**Motion** 3:6 50:13
**mouthful** 6:17
**move** 33:4

**N**

**N's** 26:8
**nailbiters** 24:24
**name** 5:24 6:2,3
  15:20 26:4
  36:15 38:13
  41:5,12 52:8
**names** 52:12
**nationally** 46:22
**nature** 7:22 30:3
  38:15
**necessarily** 36:15
**necessary** 5:19
**need** 8:9 68:9
**never** 33:24 34:12
**new** 12:4 53:3,18
  55:1
**news** 23:11
**nickel** 12:13,13
**nonlawyer** 72:5
**North** 1:2 4:12
  40:24 41:5,14
  41:24 42:21
  43:25 44:20
  46:6 49:21
  51:14 52:10,16
  54:3,17 57:14
  58:4 59:3 61:3
  62:19 63:9 64:4
  67:3,5 72:17
**nos** 7:21
**Notary** 1:17 74:3
  75:9
**note** 5:12
**notebook** 72:15
**notice** 2:9 19:15

19:25 20:8
  27:11
**novel** 24:22
**November** 58:16
**number** 20:12
  26:8 32:2
**numbers** 20:11
  31:11
**numerous** 22:11
  23:24

**O**

**object** 58:7
**objection** 36:24
  39:11 42:5 44:1
  46:23 47:6,17
  54:24 56:6,7
  57:5,17,18 58:6
  59:4 60:11,11
  60:20 61:11,12
  62:7,25 63:10
  63:17 64:6,7,13
  66:11 68:3,18
  68:25 70:2,11
  70:23 71:10,21
**objections** 61:19
**obtain** 9:24 10:4
**obtained** 10:11,13
**obviously** 7:19
  17:21 24:6
  26:23 54:11
**occurred** 21:8
  22:7
**off-the-record**
  55:7
**offer** 15:10
**office** 29:13 30:20
  30:22 75:2
**oh** 33:6 53:13
**Ohio** 1:17,19
  29:20 30:1 74:1
  74:4 75:2,9
**okay** 6:7,13,19 7:1
  7:8,16 8:12,16
  8:22 9:4,4,10,21
  9:24 10:1,4,7,11
  10:13,13,17,25
  11:2,11,14,21
  11:25 12:2,5,8
  12:14,17,23,25
  13:2,16,18 14:1
  14:7,19,24 15:1
  15:2,4,13,15
  16:2,22 17:2,13
  17:17,20,25
  18:2,11,16,22
  19:6,9,25 20:4

20:15,17,23
  21:20,25 22:10
  22:15,22 23:8
  23:19 24:24
  25:20 26:6,12
  26:15,22 27:6
  27:10,24 28:4,4
  28:10,14,17
  29:4,14,18 30:4
  30:10,23 31:4,8
  31:11,14 33:8,9
  33:13,22 34:4
  34:14,16,24
  35:1,6,9,12,22
  35:25 36:6,14
  36:20 37:7,23
  38:2,16 39:1,15
  39:23 40:6,11
  40:15 42:18
  43:5,20 44:3,10
  44:16 45:12,15
  45:21,24 46:2
  46:10,16,25
  48:1,9 50:5,7,25
  53:8,21,21 54:9
  55:12,18 56:11
  57:11 58:8,14
  58:25 59:15,18
  59:25 60:7,25
  62:1 63:23
  65:11,21 66:5
  67:6 68:5 69:11
  72:16,23
**once** 13:25 23:2
  71:23
**ones** 35:10
**ongoing** 24:9
**open** 24:1 66:24
**opening** 20:9
**opportunity** 56:14
**ordinary** 37:4
**Orton** 1:8 3:5 5:16
  6:11,14,15,18
  8:14,17,18 9:7
  17:8,12,15,20
  18:12 20:25
  25:12 28:7,8
  29:9 30:9,23
  31:1 34:14 39:3
  40:1,17 41:8,11
  41:22 42:25
  43:1,23 44:24
  45:6 46:18,22
  46:25 47:14
  48:1 49:1,12
  50:1,12 56:4,20
  57:13 58:1,15
  60:3,3 61:4,9

62:6,17 63:6,24
  64:3 65:3 67:19
  69:14,20
**Orton's** 30:6
**outside** 9:1 38:3
  66:17
**overlap** 14:3
**oxide** 12:13

**P**

**packaged** 57:4
  61:9
**packaging** 7:6
  26:20 54:18
  57:9
**packing** 22:20
**page** 2:1 20:14,16
  51:9
**pages** 29:1 32:11
  32:22 33:15
**paid** 44:8
**pain** 15:7
**paper** 69:22
**paragraph** 42:24
  43:5 46:18
  51:10 52:7
  54:15,22
**paragraphs** 52:23
**pardon** 15:6 25:17
**part** 64:1 72:20
**particular** 22:13
  27:7 35:10
  47:20 66:2
**particulars** 39:19
  40:2
**parts** 11:9 14:17
  14:20 53:6
**party** 7:11 74:15
**paying** 48:18
**payment** 57:23
  61:22
**peek** 42:14
**people** 26:18
**percent** 48:22
**performing** 18:16
**period** 21:5 29:6
  43:23 47:18
  53:6,14,16 56:5
  57:15,18,21
  58:7 60:4 61:7
**perk** 9:4
**perks** 8:23
**person** 20:19
  23:20 48:17
  66:8
**personal** 21:2,17
  24:7

personally 8:18
35:6
phone 24:15
pick 7:19
picking 48:18
piece 69:22
Pittsburgh 10:3
place 36:23 71:14
71:19
plaintiff 1:6,14 4:2
5:25 27:20
plaintiff's 2:7,12
2:16 3:1,7 5:10
19:13 32:23
42:8 50:9,13,18
please 5:3 6:2
7:14,17 37:15
41:9 42:3 50:20
52:18 59:7 64:9
68:6 69:5
PLLC 4:9
point 44:3 52:2
pointed 67:18
policy 28:8,10,11
pollution 14:22
Polytechnic 9:23
portion 34:6,9,15
position 9:1 45:25
possession 56:21
63:24
possible 40:4
67:4,6
possibly 22:5
pre-1932 29:17
30:1,3
prepare 22:1,3
prepared 56:15
60:1
presence 74:11
present 4:14 25:3
47:11 49:24
presented 42:19
presently 45:17
49:21
president 15:5
16:13
pretty 12:9
previous 9:8 23:1
48:12,13
primarily 12:11,11
12:12 17:4 18:4
26:19 46:25
primary 48:11,25
principal 23:16
25:6
Principally 14:21
print 47:1

prior 9:16 21:8,15
21:16 24:15,16
probability 72:21
probably 23:7
37:18 55:25
Procedure 1:16
produced 32:12
33:9,24 37:9,12
producing 14:16
product 45:4,8
49:3
production 30:20
products 11:6,8
44:6,8 45:6,9,13
45:16 46:1,7
49:12,16 57:13
58:3 64:3
progresses 23:4
promise 13:10
50:8
properties 18:5,7
18:8
protection 11:6,7
provide 32:15
provided 5:17
33:17 40:21
44:24 51:5,16
58:2 69:8
Public 1:17 74:4
75:9
publications 47:2
purchase 46:13
49:16 61:4
62:17
purchased 41:22
43:1 46:4,7 62:5
64:3
purchasing 60:2
69:20
purposes 2:11,14
2:18 3:8 19:16
32:25 42:10
50:14
pursuant 1:15
put 5:12 20:10
37:17 40:8 65:1
pyrometric 17:22
18:23 29:16
39:3 40:17
41:11,23 42:25
43:24 44:6
46:18 54:19
60:3 61:4,9 62:6
62:18

_____
**Q**
qualified 74:5

question 7:12 8:4
8:6 21:13 26:19
33:23 37:16
40:1 41:9 42:1,4
52:18,19 59:6,9
61:15,18 63:20
64:9,12 67:18
68:7 69:5,24
70:17 71:16,24
72:7
questions 64:10
65:7 69:4 72:24
quick 33:15 67:17
quiz 23:10 56:1

_____
**R**
raise 5:4
rambled 52:20
range 12:9 14:2
react 18:9
read 22:17 24:16
27:10 37:21
42:2,4 43:3,7
59:7,9 61:17,18
64:12 69:18
reading 9:16
24:22
reads 58:17
real 24:23
really 16:21 44:14
52:21 68:20
reason 8:8 66:6
reasonable 36:25
39:5
recall 20:2 26:14
28:3 42:16 50:2
51:1,7 56:18
60:2 71:4
receipt 33:21 34:9
34:15 35:4,13
35:20 36:12
38:7,11,16 39:2
39:9,20 40:12
40:16 41:17
43:14,22 44:4,5
44:7,18 56:3
58:1,25 59:12
60:9 63:6,25
66:2 67:21
68:17 69:7
70:18 71:7,17
receipts 55:15
58:16
received 13:7
57:22 61:22
64:16 66:7,15
67:20

receiving 30:21
recollection 55:18
55:19 58:10
record 5:2,12 6:1
8:2 51:12 52:9
53:12,15 54:16
55:3,5,10,13
records 52:14
53:23,24,25
54:1,6,6
RECROSS-EXA...
67:15
recruited 24:8
reduced 74:10,12
reduction 14:22
refer 6:14 8:16
33:20 45:13
reference 30:1
35:12 41:15
54:7
referenced 46:17
67:2
references 46:13
67:2
referred 6:13
45:12,22
referring 8:17
27:14
refers 53:20
reflect 7:21 39:2
40:17 44:18,19
54:2,10 55:15
65:16 70:18
71:18
reflected 66:8,17
67:20 68:16
refuse 15:10
regard 22:14
regarding 53:19
region 47:21
regions 47:15
regular 38:17
43:1 62:18
regularly 61:2
relate 27:25
related 26:20 27:2
29:16
relates 26:25 70:5
relating 5:14
relationship 7:3
22:19 24:7,9
relative 19:7
74:15
remember 7:17
35:17 67:7
repeat 7:14 37:15
41:9,25 52:18
59:6 61:15 64:9

68:7 69:5
repeatedly 61:9
rephrase 7:15
report 18:7 56:15
reporter 5:5
reporter's 7:18
reporting 74:17
represent 41:2
42:18 58:14
59:1 60:25
representation
61:5
representative
58:23
representing 5:25
request 5:16
requested 20:8
resalers 41:8
reseller 38:14
50:4 54:16
resellers 39:3
41:11 48:3
reserve 5:15
resilient 11:13
respect 20:22
responsible 27:9
36:11
retain 28:12
retention 28:7
review 24:20 29:1
33:16 40:12
50:20 51:6
56:15
reviewed 22:23
27:2,20 28:1
51:1
reviewing 21:22
26:24
ride 6:23
right 5:4,15,22,23
6:19 12:20
13:12 15:11
16:10 17:20
26:7 35:8 51:21
51:24 52:6
58:18 64:8 66:4
66:24 67:13
69:23 70:8
road 5:18
role 12:5 13:23
15:4 17:14
26:10
room 8:1
round 31:11
Rule 74:19
rules 1:15 7:10
run 19:10 35:21

## S

safe 36:20
sale 18:23 40:17
43:23 44:18,19
65:23 66:1
70:19
sales 47:14 51:12
52:9,14 53:13
53:15 54:2,10
55:15 56:4 59:1
63:8 70:9 72:16
saying 23:21
51:25 53:10,24
58:10 59:20
says 42:24 43:5
51:9,11 52:8
53:12 58:20
60:6 69:19,23
school 11:15
Scientific 56:15
56:17
scope 44:2 46:24
47:18 56:7
57:18 61:12
63:11,11 64:7
68:4
seal 75:2
Sealey 2:2,4 4:4
5:10,11,21,24
19:10,17 20:18
23:12 27:15,23
32:9,18 33:1
37:2 39:14 42:2
42:11 44:9 47:3
47:9,22 50:16
55:3,11 56:10
57:10,24 58:13
59:7,14 60:13
60:24 61:17,25
62:10 63:4,14
63:22 64:21
65:6 66:11
67:16 68:10,22
69:1 70:7,13
71:6,15 72:1,23
second 20:10
30:19 55:13
see 8:2 20:15,16
23:21 24:3
37:19 46:12,20
seeing 20:2 42:16
seek 23:15
seen 19:22,22
27:22 33:11
34:13 38:6
42:15 50:19
51:7

sell 19:2 45:7,17
47:15 48:7 49:2
49:8,12
selling 47:20 48:2
48:3,4
send 68:14
Senior 14:8,13,15
16:12
sense 7:13
sent 57:2
service 18:17
44:23
services 44:11,22
set 75:1
seven 28:12 29:2
29:3,4
seventy 18:20
shakes 7:19
shelves 31:22
shipping 30:21
shop 30:22
show 50:7
showed 19:11
shown 57:3
shy 20:25
Simmons 4:3
single 24:1 48:23
sir 6:21 8:15,21
9:3 17:16 19:8
19:19 20:21
33:3,12 38:19
39:22,24 40:10
40:19 42:13
50:17 51:15
65:8 67:11
69:24 71:17
72:3
site 31:5,7
sitting 38:3
Sixteen 31:13,17
skipped 12:25
slightly 17:19
64:10
small 16:25,25
25:22
sold 42:25 43:15
44:5 45:16
48:23 57:13
58:3 61:9
soldering 11:5
somebody 36:15
36:21
sorry 27:18 28:1
31:18 37:20
41:25 55:12,19
59:5 61:14 64:8
sought 22:23
23:14

sounds 26:25
sources 21:22
South 4:11
space 31:20
span 35:16,19
spans 38:4
spare 23:13
speak 54:12 68:1
specific 12:8
36:22 59:20
63:20 65:16
67:8
specifically 22:4
26:25 27:25
specified 28:23
specify 8:19
speculate 68:20
speculating 38:25
56:8 62:21
68:21
speculation 72:19
spell 13:21 26:3
spend 8:24
spent 22:24 26:23
spoken 20:5 25:1
spokesperson
8:13
SS 74:2
stamped 58:15
Stand 73:2
Standard 29:16
start 9:11 12:18
72:20
started 13:12,14
17:15 18:15
25:14
starting 9:17 13:6
20:11
starts 20:12
state 1:17 6:2
29:20 30:1
49:21 74:1,4
75:9
statement 49:6,11
53:19 54:22
58:20
statements 52:23
states 1:1 18:18
58:16
stenographically
74:11
Steve 4:15
stopped 54:18
stopping 48:17
storage 31:5
store 31:7 41:4
49:7,10

stored 29:10 31:9
32:2
stores 49:13,17
story 30:19
straightforward
72:6
Street 4:5,11
strike 30:15 39:8
47:10
Stu-Doodle 40:18
40:23 41:6,7,12
41:16,23 42:21
42:25 43:6,16
43:24 44:20
46:6 49:2,6
51:13 52:9,15
52:15 54:3,7
55:16 57:14,23
58:4,17 59:2,16
59:23 60:2 61:3
61:10,23 62:19
63:8 64:4,16
68:14 69:9
70:10,19 72:17
subsequently
51:16
suburb 14:10
sucked 17:8
Suite 4:11
Supplemental 3:3
50:10
supplied 41:8
64:3
suppliers 41:11
supply 15:19 41:4
49:7,10,13,17
support 3:4 45:25
50:11
sure 6:3 13:8
20:16 21:12
23:3 26:7 28:17
31:12,16 33:6
34:11 37:17
38:21 41:10
48:15 50:22
64:11 67:1,9
surfaces 11:9
surprised 34:21
sworn 5:4,8 74:8
system 14:21
38:24

## T

T-E-R-V-I-S 15:24
take 2:9 8:9 19:15
50:24
taken 1:16

talk 10:17 28:6
32:8 72:20
talked 23:1 24:14
24:24 25:23
30:17 44:24
talking 6:15 21:21
24:3 57:25
65:15 66:22
68:7
tape 33:7
Technology 11:24
12:6,15 13:5
tell 9:5 16:4 18:2
29:8 46:3
temperature 18:5
18:10
tends 38:12
tenured 25:7,13
terms 7:5 25:25
27:8 59:12
65:22
Tervis 15:24 16:2
16:6,11
test 19:1,2 25:19
testified 61:1
testify 74:8
testifying 21:1,16
testimony 19:7
37:23 40:21,25
41:3,21 43:11
51:15 57:19
60:12 61:20
62:16 64:1,2
70:3 71:3 74:10
testing 18:1,24
19:4,4 44:25
45:1,2 57:2
tests 18:3
thank 19:20 33:4
65:7 66:24
67:11,13 70:16
thesis 13:14
thing 23:16 46:16
50:7 61:21
things 7:21 8:1
14:15 22:9,11
22:15 23:21
26:2 45:18
72:14
think 8:7 18:19
23:6 32:14
37:18 43:16
44:7 49:11 50:8
53:1,11 54:25
58:9 60:16
61:21,24 64:19
68:6,11,19
70:15 71:11,12

72:19,25
**third** 18:25 20:13
  20:16
**thirty-two** 53:13
**thought** 25:19
  27:17 55:25
**three** 17:23 45:3
  49:20,23,25
  50:4 51:9 53:19
**thumb** 33:14
**till** 13:17
**time** 5:3 7:12 8:16
  8:24 20:2 21:5
  22:9,25 23:4
  28:24 29:7 36:2
  43:23 44:2 45:8
  46:24 47:17
  48:23 49:24
  50:24 52:2 53:2
  53:2,6,13,16,20
  56:5,7 57:15,18
  57:21 58:7 60:4
  61:8,12 64:7
  65:8 71:14 73:1
**times** 23:24 28:23
**titled** 2:9,17 3:2
  19:14 42:9
  50:10
**today** 5:2 6:24
  8:25 16:21 19:7
  21:2 27:1 28:7
  38:18 40:22
  51:15 53:14
  69:8
**today's** 5:14 20:1
  20:6 22:1 28:2
**told** 23:22 57:6,8
**Tom** 26:1
**Tom's** 26:10
**top** 37:19
**topics** 5:14,17
**torn** 72:6
**totality** 40:14
  53:22
**totally** 56:9 62:21
**trace** 7:5 34:8
**track** 34:22
**transaction** 71:18
**transactions**
  36:22 39:19
  40:2 67:25
**transcript** 7:20
  27:3,13,14,16
**transcripts** 9:16
  24:17,17,21
**treatment** 22:20
**trick** 13:10

**tried** 24:1
**Trigon** 15:21
**Troncone** 4:15
**true** 33:16 47:11
  47:23 53:7
**truth** 74:8,8,9
**try** 7:17 8:2 22:12
  23:4 28:16
  32:15 69:5
**trying** 7:25 11:12
  13:10 21:10,12
  32:9 46:11 58:9
  59:19 61:15
  68:11 71:24
**Turning** 54:14
**twelve** 15:11
**twenty** 31:13,17
**twenty-nine** 25:16
  25:17
**twenty-six** 25:15
**twenty-two** 54:15
  54:22
**two** 9:19 11:15
  17:25 26:18
  28:25 43:5
  49:20
**two-page** 28:21
**type** 14:1,15 17:2
  23:20 28:20
  29:20
**types** 14:19 22:15
**typewriting** 74:13

**U**

**uncovered** 34:3
  53:14
**understand** 7:12
  8:12 53:10
  64:11 72:13
**understanding**
  6:23 7:2
**understands** 48:1
**understood** 8:6
**UNION** 1:9
**United** 1:1 18:18
**University** 10:3
  10:10
**unlimited** 44:2
  63:11
**users** 48:2,5

**V**

**variety** 46:1
**various** 18:17
**Venice** 16:15
**vents** 45:19 46:14
**verbal** 7:18

**verify** 39:12
**vermiculite** 22:14
  54:19 57:4,9
  61:10
**vice** 15:5 16:12
**video** 5:2 7:19
**Videographer**
  4:15 5:1 55:5,9
  73:1
**Videotaped** 1:13
**Virginia** 9:23
**vs** 1:7

**W**

**Wait** 13:8
**walk** 9:14 30:21
**want** 5:12 13:3
  32:13,14 33:25
  64:10 69:4
**wanted** 28:5 52:1
  66:21
**wasn't** 71:14
**way** 32:10 37:14
  39:13 40:9
  56:12 60:8,14
  60:17,18 71:12
**website** 49:19
**WEBSTER** 1:4
**welcome** 6:22
**welding** 11:5
**went** 11:23 13:20
  14:8 15:3,8,13
  15:17,23 23:24
  34:17 35:3
  52:12 55:13
  61:2
**WHEREOF** 75:1
**wholly** 53:4
**wide** 12:9 14:2
**widely** 23:17
**witness** 1:14 5:7
  20:15 21:14
  27:18,21 36:25
  39:12 42:7 44:3
  46:25 47:7,19
  54:25 56:8 57:6
  57:20 58:8 59:5
  59:10 60:22
  61:14,21 62:8
  63:1,12,19 64:8
  64:14 65:11
  66:13 67:13
  68:5,19 70:4,12
  70:25 71:4,11
  71:23 74:12
  75:1
**work** 10:18 12:14

12:24 13:15
  14:8 15:17,24
  16:6
**worked** 10:22
  11:23 12:10
  13:5,17 16:24
**workforce** 10:20
**working** 12:21
  14:18 17:15
  20:25
**wouldn't** 19:21
  20:4,9 29:11,24
  33:3 42:13 54:5
**writing** 74:11

**X**

**Y**

**Yeah** 24:19 31:2
  34:19 36:10
  47:7 52:21
**year** 17:1,10
  37:19 47:13
  52:22 53:13
  54:21 65:22
  66:18
**year-plus** 26:23
**years** 11:15 12:16
  13:6 15:8,11
  16:7 22:21
  25:15,16,17
  28:13 29:2,3,4
  35:4,9,14,15,17
  35:17,18,19
  53:20 54:2,8
  65:17 66:9 70:5
**yeses** 7:21
**yesterday** 20:3
**Yetis** 16:3
**York** 12:4

**Z**

**0**

**0474** 58:15

**1**

**1** 2:8 19:12,14
**10:02** 1:19 5:3
**11:03** 55:6
**11:05** 55:10
**11:26** 73:1,4
**18** 52:24
**19** 2:11 52:24
**1932** 30:9
**1963** 35:21 37:14
  37:25 38:5

47:11,24
**1970** 47:10 54:11
  70:10
**1970s** 61:8
**1973** 37:13
**1974** 37:22,25
  38:4,5 43:7
  51:12 52:9
  53:16,25 57:15
  60:4 65:18
  66:18 68:15
  69:9,20 70:19
  71:19
**1975** 65:24
**1976** 40:7
**1977** 55:16,16
  58:2,10,16,21
  61:23 64:17
  70:6
**1978** 43:16 57:21
  58:10,12
**1980** 43:16 55:17
  57:21 58:3,12
  58:21 59:2
  61:23 64:18
  70:6,10,14,15
**1980s** 61:8
**1982** 9:25 10:20
  10:21
**1983** 54:19 57:16
**1984** 10:21 43:7
  60:4 69:21
**1985** 35:24 38:5
  38:24 65:18
  66:19
**1986** 13:13
**1987** 10:6
**1990** 13:17,19,20
  25:14 54:17
**1991** 12:23 54:17
  67:5,10
**1993** 10:12
**1995** 13:19,20
  14:7
**1999** 14:7 15:14
  50:4,6 67:4,10

**2**

**2** 2:13 32:13,24
  65:15 71:8
**2:17-CV-63-D** 1:7
**2000** 21:13
**2006** 51:12 52:9
  53:16
**2011** 15:1,12,13
  15:14,14,16
**2013** 15:14,16,22

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com
Case 2:17-cv-00063-D   Document 63-3   Filed 05/21/19   Page 84 of 85

15:23 16:12
**2017** 16:9,12,22
  16:24 24:14
**2018** 17:10 21:16
  34:25 51:22
**2019** 1:19 5:2 75:3
**22** 1:19
**22nd** 5:2
**259-2222** 4:6
**28(D)** 74:19
**28204** 4:12
**28th** 75:3
**29th** 34:25 51:20

—————— **3** ——————
**3** 2:17 42:9
**301** 4:11
**32** 2:15
**372-2700** 4:12

—————— **4** ——————
**4** 3:2 50:10,18
**4-18-2020** 75:9
**42** 2:19

—————— **5** ——————
**5** 2:2
**50** 3:9
**5th** 65:24

—————— **6** ——————
**60s** 18:14
**618** 4:6
**62002** 4:6
**65** 2:3
**67** 2:4

—————— **7** ——————
**70** 70:12
**704** 4:12
**74** 37:13
**77** 59:1 70:14,15
**78** 55:19 58:10

—————— **8** ——————
**80** 54:11 55:19
  70:12
**82** 10:14
**84** 11:18
**8535** 1:18
**87** 10:15 11:18,22
  13:6,13

—————— **9** ——————
**900** 4:11
**90s** 67:9
**92** 12:24

**93** 10:15
**99** 14:24 15:1 50:5